Staunton.

HEAD-LIPSCOMB-MCCORMICK COMPANY, INC.
v.
CITY OF BRISTOL.

September 16, 1920.

Absent, Burks and Kelly, JJ.

1. MUNICIPAL CORPORATIONS — *Property Rights — Acquisition and Alienation.*—The general rule is that the charter or legislative act is the source of power as to the property rights of municipal corporations, and that when silent the implied power exists to acquire and alienate property.

2. MUNICIPAL CORPORATIONS — *Property Rights — Acquisition and Alienation—Qualifications of Rule.*—Municipal corporations possess the incidental or implied right to alienate or dispose of the property, real or personal, of the corporation, of a private nature, unless restrained by charter or statute; they cannot, of course, dispose of property of a public nature, in violation of the trusts upon which it is held, and they cannot, except under valid legislative authority, dispose of the public squares, streets, or commons.

3. MUNICIPAL CORPORATIONS — *Alienation of Property — Property Dedicated to Public Use.*—While at common law a municipal corporation could, unless restrained by its charter, dispose of its lands and other property just as private individuals could, in this country it is generally held that a municipal corporation has no implied power to sell property which is devoted to a public use, but property of which the public use has ceased, or which has never been devoted to any public use, may be sold by the municipality owning it, by virtue of its implied power.

4. MUNICIPAL CORPORATIONS — *Alienation of Property — Property Dedicated to Public Use—Meaning of the Term Dedication.*—While municipal corporations have no power to dispose of property of a public nature, in violation of trusts upon which it is held, there is a distinction between property purchased for a public use and not yet dedicated and property purchased for that purpose which has been actually dedicated. Dedica-

tion, in this connection, has a definite meaning. It means: Devoted to the public use; set apart for the public use; given over to the public use; appropriated for the public use.

5. MUNICIPAL CORPORATIONS—*Alienation of Property*—*Case at Bar.* —In the instant case the city desiring to build a new courthouse, and finding that it needed more property for that purpose, purchased under the authority conferred by section 2854, Code of 1919, adjacent property. On the property purchased by the city stood a two-story factory building. After erecting the new courthouse the city not needing all the property purchased, after laying out a street between the courthouse and the factory building, conveyed the factory building to defendant. While the city held the factory building it was rented to and used by a manufacturer for private business purposes. The city claimed that the conveyance to defendant was *ultra vires,* as Code of 1919, section 2854, authorized the acquisition of two acres for courthouse purposes, and the mere purchase operated as a dedication to public uses, as the land acquired for the courthouse was less than one and one-third acres. The city charter authorized the city to dispose of any and all real estate owned by it.

*Held:* That the conveyance to defendant was not *ultra vires.*

Appeal from a decree of the Circuit Court of Washington county. Decree for complainants. Defendant appeals.

*Reversed.*

The opinion states the case.

*Peters, Lavinder & Peters,* for the appellant.

*Henry Roberts, S. V. Fulkerson, D. F. Bailey* and *Frank W. DeFriece,* for the appellee.

PRENTIS. J., delivered the opinion of the court.

The Head-Lipscomb-McCormick Company, Inc., appellant, complains of a decree which sets aside and annuls a conveyance of what may be called the northern end of the Gauthier property, conveyed to it by the city of Bristol. After the conveyance, the city filed its bill, alleging that its contract and deed pursuant thereto were *ultra vires* and void for lack of power to convey, and certain citizens and taxpayers of the city, who felt aggrieved, were allowed to file their petition and were admitted as parties complainant.

For the better understanding of the facts of the case, a plat of the property involved is herewith printed:

It appears that the city already owned the land shown on the plat bounded south by Cumberland street, west by Lee street, east by Water street and north by the Gauthier property, the dividing line between the two properties being indicated by dotted line running from Lee to Water street about fifteen feet south of Court street. The city council desiring to build a new courthouse, and finding that it needed more property for that purpose, bought the Gauthier property, which constituted the rear or northrn portion of the block lying between Cumberland, Lee, Terry and Water streets. There was at that time upon the north end of the Gauthier property a two-story brick factory building, and this building still stands. Since buying the property the city has erected its courthouse as indicated on the plat, extending the rear of the building over upon the Gauthier property, curbed the square thus occupied by the courthouse building, and has opened, paved and dedicated Court street, twenty-five feet wide, in the rear of the courthouse, upon the Gauthier property, which was acquired in 1908. At one time certain cages were put in what is called the annex of the Gauthier building, and used temporarily as a jail; but this proving unsatisfactory, the city has since bought and erected a jail on a lot on the east side of Water street opposite the Gauthier building. The Gauthier building has been leased to a tenant during the time of the city's ownership, and, as indicated, the property was sold and conveyed to the appellant in April, 1919, the dividing line being the northern line of Court street.

The trial court set aside the conveyance, adjudging it to be null and void.

It is necessary first to determine the powers of the city of Bristol as to this real estate. This is a question of law, and that having been determined, there arises a question of fact.

The city relies chiefly upon Code 1919, section 2854, which

provides: "There shall be provided by the board of super-visors for every county and the council for every city, a courthouse, clerk's office and jail, the cost whereof and of the land on which they may be, and of keeping the same in good order, shall be chargeable to the county or city, and the supervisors of the county or the council of the city, may purchase so much land as, with what it has, will make two acres, whereof what may be necessary for the purpose, shall be occupied with the courthouse, clerk's office and jail and the residue planted with trees, and kept as a place for the people of the county or city to meet and confer together; * * * * and shows that the area of the property thus acquired by the city for the courthouse and jail is less than one and one-third acres; and claims that this statute is re-stictive and marks the limit of the city's power as to this property.

Section 28 of the charter of the city of Bristol (Acts 1908, p. 463), however, empowers the city council, by a two-thirds vote, "to buy, lease, sell, or otherwise dispose of any and all real estate that is or may be owned by said city," and provides that the council "shall have the right to donate and convey the same, or any part thereof, to manufacturing in-dustries that may be located in said city, and may make such ordinances and by-laws relating to the same as they shall deem proper * * * ."

[1, 2] The general rule is that the charter or legislative act is the source of power as to the property rights of municipal corporations, and that when silent the implied power exists to acquire and alienate property. This general rule is subject to the qualification stated by Mr. Dillon thus: "Municipal corporations possess the incidental or implied right to alienate or dispose of the property, real or personal, of the corporation, of a private nature, unless restrained by charter or statute; they cannot, of course, dispose of property of a public nature, in violation of the trusts upon

85

which it is held, and they cannot, except under valid legis-
lative authority, dispose of the public squares, streets, or
commons." 3 Dillon Mun. Corp. (5th ed.), section 991.

3 McQuillin Mun. Corp., section 1140, states the same rule
and says this: "All property held by the city in fee simple,
without limitation or restriction as to its alienation, may be
disposed of by the city at any time before it is dedicated to a
public use. In other words, the city has the right to sell or
dispose of property, real or personal, to which it has the
absolute title and which is not affected by a public trust, in
substantially the same manner as an individual unless re-
strained by statute or charter; and this power is an inci-
dental power inherent in all corporations, public or private.
Thus, land held by the city in full use and ownership—*e. g.*,
commons acquired by confirmation under act of Congress—
may be sold when no longer needed for public use. So land
bought for a public purpose, if not actually so used, cannot
be said to be affected by a public trust, and hence may be
sold."

1 Devlin on Real Estate (3d ed.), section 348a, recog-
nizes the same doctrine, and says that "When title is vested
in a municipal corporation by deed, without limitation or
restriction as to its alienation, the property may be conveyed
at any time before it is dedicated to a public use."

[3] While at common law a municipal corporation could,
unless restrained by its charter, dispose of its lands and
other property just as private individuals could, in this
country it is generally held that a municipal corporation has
no implied power to sell property which is devoted to a
public use, but property of which the public use has ceased,
or which has never been devoted to any public use, may be
sold by the municipality owning it, by virtue of its implied
power. 19 R. C. L. 773.

A leading case on the general subject is *Ft. Wayne* v. *Lake
Shore Mich. Southern R. Co.*, 132 Ind. 558, 32 N. E. 215,

18 L. R. A. 367, 32 Am. St. Rep. 277. There the city had purchased land for a park, but before it had been actually dedicated to the public, conveyed part of it to a railroad company for a yard, shops and depot grounds, and the conveyance was upheld. The court uses this language: "Municipal corporations cannot dispose of property of a public nature in violation of the trusts upon which it is held, nor of a public common; but there is a distinction between property purchased for a public common and not yet dedicated, and property which is purchased for that purpose and actually dedicated to that use."

In the case of *Beach* v. *Haynes,* 12 Vt. 15, land had been purchased for a public common, and it was so expressed in the conveyance, but before it was actually appropriated to that use it was conveyed by the town, and it was held that such a conveyance vested a good title in the grantee; which in the later case of *State* v. *Woodward,* 23 Vt. 92, it was held that a municipal corporation could not convey away a public common after it had been actually dedicated to the public use.

In *Palmer* v. *Albuquerque,* 19 N. M. 285, 142 Pac. 929, L. R. A. 1915A, 1107, the same rule is enforced. There the city of Albuquerque had acquired the land for the purpose of erecting a city hall thereon, and raised and expended $29,000 in the erection of the building, but not having completed it, and finding itself without sufficient funds to complete it, borrowed from a bank and proposed to convey the land to the bank, including the city hall building which was in the course of construction, upon condition that the bank should permit the city to complete the building in accordance with the plans and specifications theretofore adopted, that the bank would furnish the money necessary to complete it, not to exceed $25,000, and that the city should have an irrevocable right to repurchase the premises from the bank at any time within ten years from the date of the conveyance for

the amount actually paid by the bank in the completion and furnishing of the building. There were other provisions for the adjustment of accounts, between the city and the bank, and for the leasing of the building by the city and the payment of rent therefor. This contract was upheld.

[4] While, generally speaking, property devoted to a public use cannot be sold or leased without special statutory authority, still when such use of the property has ceased and it is no longer needed, it may then be sold or leased as the public welfare may demand. *Ogden* v. *Bear Lake, etc., Co.,* 18 Utah 279, 55 Pac. 385, 41 L. R. A. 310. While municipal corporations have no power to dispose of property of a public nature, in violation of trusts upon which it is held, there is a distinction between property purchased for a public use and not yet dedicated, and property purchased for that purpose which has been actually dedicated. Dedication, in this connection, has a definite meaning. It means: Devoted to the public use; set apart for the public use; given over to the public use; appropriated for the public use.

In *Konrad* v. *Rogers,* 70 Wis. 492, it appears that under authority to purchase land for city hall and lock-up, the council bought a lot for $275, and it was conveyed to the city; that subsequently the council bought another lot for $1,000 and conveyed to the vendors thereof the lot previously purchased for the sum of $300 in part payment for the new lot; and it was held that the council had the power to make such new purchase and to issue orders on the city treasury for the balance of the purchase money.

The additional inquiry of fact here then is whether or not that part of the Gauthier lot which had been sold and conveyed to the appellant has ever been devoted to public uses.

[5] It is claimed for the city that inasmuch as the statute (Code 1919, section 2854) authorizes the purchase of two acres, and the land purchased was less than two acres, the mere purchase operates as a dedication to public uses; and

that this is still further manifested by the resolution of the city council authorizing the purchase for the new courthouse. On the other hand it is claimed that the city did not need all of the Gauthier property, but was forced to buy it all, because the owner would not sell a part. That it was clearly understood between the parties that the city did not immediately need all of the Gauthier lot for the erection of the new building is apparent from the written offer of the vendor which was accepted by the city. This offer shows that the city was to have possession of so much of the lot as the city needed for the purpose of erecting the new building, within thirty days from the date of the transaction, while possession of the remainder of the lot and building was deferred until July 1, 1908. It is said in answer to this, that the city might have condemned what it needed, and was not dependent upon the will of the vendor. While this is true, that does not change the significance of the facts stated as to the possession. The city desired immediate possession of the part which it then needed for the new building. It could get such possession by purchasing, while under condemnation proceedings there would probably have been much greater delay. Then there is the statement by the owner of the property that the price named to the city is less than would have been made to any one else, and this price may have been the inducement to the city council to purchase the entire lot, although needing only a part of it for public use. Then, in pursuing the inquiry as to whether the property conveyed and here involved has ever been devoted to public uses, we find that the city in laying off its courthouse square, stopped the granolithic curbing at the corner of Court street; that the Gauthier building has been occupied by a tenant for many years since the purchase, thus being devoted strictly to private use (except that the annex thereof was used temporarily for jail purposes); and that while the two-story brick building remained thereon,

it was physically impossible to dedicate such land to the public use as a part of the courthouse square. That it never has been so devoted to any such public use is so apparent to us that the mere statement of these facts carries conviction.

The question before this court is not whether it was wise or unwise for the city to sell the property. That was a question of public policy for the city council, about which there is a fair difference of opinion. The only question we have to determine is whether or not the city had the power to make the sale. As to this we have no doubt, because of the opinion that the property has never been dedicated to the public use. If it had been so dedicated as a part of the courthouse square and used, as was true in *County of Alleghany* v. *Parrish*, 93 Va. 615, 25 S. E. 882, which is so confidently relied upon, then the city could not have made the sale. In that case there was no doubt either about the dedication of the property to public use, or that it was so used at the time the lease was made. So, in *Franklin County* v. *Gills & Johnson*, 96 Va. 330, 31 S. E. 507, there was no question as to the public character of the property or its public use, for it was a room in the courthouse of Franklin county, which the defendants, who were merchants, claimed the right as tenants to use as a place for storage of their goods. No such question was raised in either of those cases, as is apparent here, and we do not question their authority in the slightest degree. The city held the property which was sold to the appellant, a two-story brick warehouse, rented to and used by a manufacturer for private business purposes as the tenant of the city in its (the city's) private capacity. The city has express authority under its charter to sell its real estate thus held, and hence the circuit court erred in annulling the conveyance.

There are other questions raised in the record, but in our view those which we have discussed are decisive.

*Reversed.*

SIMS, J., dissenting:

I cannot concur in the conclusion of the majority opinion, that the whole of the lot bought by the city from Gauthier was never dedicated to the public use. I think the statute under which the property was acquired by the city affected it with a public trust and expressly dedicated it to the public use.

It is undoubtedly true, as laid down by the authorities cited in the majority opinion, that all property which may be owned by a municipality and is owned by it "without limitation or restriction as to its alienation, may be disposed of by * * * (it) at any time before it is dedicated to a public use. In other words, the city has the right to sell or dispose of property, real or personal, to which it has the absolute title and which is not affected by a public trust, * * * ;" (3 McQuillin Mun. Corp., section 1140); or, as stated in 3 Dillon Mun. Corp. (5th ed.), section 991: "Municipal corporations possess the incidental or implied right to alienate or dispose of the property, real or personal, of the corporation, of a private nature, unless restrained by charter or statute; they cannot, of course, dispose of property of a public nature, in violation of the trusts upon which it is held. * * * " It is also true that this implied power of disposition applies to property owned by a municipality which has been dedicated to but of which the public use has ceased. This has reference, however, to cases where the public use has ceased "in the manner provided by law." 19 R. C. L., p. 773.

But the Gauthier lot was not owned by the city of Bristol "without limitation or restriction as to its alienation." It was not property to which the city had "the absolute title and which * * * (was) not affected by a public trust." It was not, after its acquisition by the city, property of "a private nature," such may be owned by a municipality in

its propriety capacity, and as to which the city, acting through its council, had the discretionary power, after the property was acquired, to devote it to a different use from those prescribed by the statute. It was acquired under the authority of the statute which is now contained in section 2854 of the Code of 1919, quoted in the majority opinion, which is the same as Code 1849, ch. 50, section 1, p. 255. As held by this court in *County of Alleghany* v. *Parrish*, 93 Va. 615, 619-620, 25 S. E. 882, in the opinion delivered by Judge Buchanan, that statute affected such property with a public trust; and, in its requirements that such property shall so far as necessary "be occupied with the courthouse, clerk's office and jail and the *residue planted with trees* and kept as a place for the people * * * to meet and confer together,' * * * exhausted all the purposes for which it could be lawfully used." As said in the same opinion (p. 621), with respect to such property, " * * * the legislature has determined for what purposes, and for what purposes only, it shall be used; for as we have seen above, using it for any other purpose than those provided for by the legislature withdraws it to that extent from the uses to which *the legislature has expressly dedicated it.*" (Italics supplied.)

And on principle this conclusion seems to be absolutely sound. The legislative authority to the city to acquire the property for the sole purposes mentioned in the statute necessarily affects the property the moment it is acquired under such statute with a public trust for those purposes, as much as if it were conveyed to the city by a grantor upon such a trust expressly stipulated in a deed of conveyance accepted by the city. The mere act of the city in purchasing the property so acquired is an acceptance of the trust and completes the dedication of the property to the purposes of the trust, *i. e.*, to the public use for those purposes. The one is a statutory and the other a common law dedication; but in

both alike the dedication is complete the moment the trust is accepted. No further act on the part of the city in the matter of actual use of the property for the purposes for which it is held in trust is needed in such case to devote it, or dedicate it to the purposes of the trust. It has been already so devoted or dedicated by the very terms upon which the title to the property has been acquired and accepted by the city. The non-action of the city thereafter in actual use of the property in accordance with the terms of the trust, or its attempt to alien or use the property for any other purpose, would be in violation of the trust and unauthorized.

As said in 3 Dillon Mun. Corp. (5th ed.), section 977: "The charter or *other legislative acts* is the source of power in respect to the property rights of the corporation." Again it is said in section 1102: "A municipal corporation has no *implied or incidental authority to alien* or to dispose of for its own benefit, property *dedicated to* or *held by it in trust for the public use,* or *to extinguish the public uses in such property.* * * * " And again in 3 McQuillin Mun. Corp., section 1141, it is said: "Property *devoted to a public use* cannot be sold or leased without statutory authority. * * * *For instance,* property *dedicated for public use* as a common, *or property conveyed to be used as an ornamental park only,* except where authorized by statute, cannot be sold. In this sense *all property is public which has been dedicated to public use, or which may be affected by a public trust, either general or special."* (Italics supplied.)

As I understand the authorities, where property is acquired by a municipality for public use, under its *implied* power so to do, or under legislative authority, or devise, or grant, which does not contain any limitation or restriction as to its alienation, the municipality may exercise a discretion after the property is acquired whether it will use it for the

86

public or dispose of it. The property is not in fact dedicated to the public use in such cases until the municipality has done some decisive act of use of the property for the public. And hence the authorities hold that in such cases the municipality may, after the property is acquired, determine not to use it for the purpose for which it was acquired, and may alienate it. But such holding obtains in such cases only, as appears indeed from the authorities cited in the majority opinion, as none of such authorities involve a case such as that before us, where the authority under which the property was acquired contains a limitation or restriction as to its alienation. Its subsequent use is merely one method of manifestation of the fact of acceptance of a dedication of property, and is material evidence to complete the dedication only where otherwise there would be an absence of evidence that the dedication has been accepted. Where the conveyance has been accepted and that conveyance, either in terms sets forth, or has imposed upon it by statute, a public trust, no further evidence of the acceptance of the trust is needed; and the dedication is completed the moment the conveyance is accepted.

I do not think that section 28 of the new charter of the city of Bristol (Acts 1908, p. 463) alters the case, for two reasons:

First: Even if such section could be construed as applicable to property bought for any of the purposes mentioned in the aforesaid statute, now contained in Code 1919, sec. 2854, it seems plain that the Gauthier lot was not bought under the authority of that section. The act providing such new charter for the city was not approved until March 14, 1908. The purchase of the Gauthier lot was made by the city council by accepting Gauthier's offer of sale on March 10, 1908, as appears from the resolution of the council on that subject adopted on such date, when no legislative authority for such action existed except the statute aforesaid

now contained in Code 1919, sec. 2854. It is true that, as. also appears from said resolution, the matter of closing the contract was referred to the financial committee and city attorney, including the obtaining of a proper abstract of title and the fixing upon the form and time of the bonds to be given for the purchase money. And, as elsewhere appears in the record, the contract was closed and the deed to the property was obtained by the city after the new charter aforesaid was in force. But nothing appears in the record. to indicate that the acquisition of the Gauthier property was completed under different statutory authority from that of Code 1919, sec. 2854, under which it was begun. However,

Secondly: Said section 28, in the authority to purchase property given thereby to the city, applies only to "any and all real estate that * * * *may be owned* by said city." (Italics supplied.) The authorities lay down, subject to certain differences of opinion in different jurisdictions, what property, including its purposes, may be owned by municipalities, in their "private or proprietary character." This includes only such property as is acquired by the municipality without limitation or restriction as to its alienation. 1 McQuillin Mun. Corp., sections 219-226; 3 Dillon Mun. Corp., sections 977-8, 1102. In view of the existence of the statute aforesaid (Code 1919, section 2854) placing the limitation or restriction aforesaid on property acquired by a municipality for court house, clerk's office and jail purposes, it seems manifest that section 28 of said new charter must be construed to have no application to land acquired for any of those purposes, but only to real estate which the municipality might own in its "private or proprietary character," as to which it possesses the discretion aforesaid of devoting it to this or that public use as the city council may deem expedient, or to decide after its acquisition that it will not devote it to any public use, but will alienate it. The authority to purchase given by said section 28 is expressly

limited to such real estate "as may be owned by said city," *i. e.*, such as the city could acquire and own under its implied or incidental powers aforesaid, independently of such section of the new charter. So that, after all, such section added nothing to the power or authority of the city to acquire real estate which it did not have prior to the enactment of such section.

I am strengthened in the view that this construction of section 28 aforesaid of the new charter of the city of Bristol is correct by the consideration of what is said in *County of Alleghany* v. *Parrish, supra* (93 Va. at pp. 620-1, 25 S. E. 882), of the proper construction of a statute (Acts April 1878-9, p. 300), which was relied on by the board of supervisors in that case as giving them authority to alienate property mentioned in the aforesaid statute contained in Code 1919, section 2854. The act thus relied on, so far as material, provided that the board of supervisors of each county should have the power, "To sell or exchange the corporate property of the county; to purchase any such real estate as may be necessary for the erection of all necessary county buildings * * * and to make such orders concerning such corporate property as now exists or as hereafter may be acquired as they may deem expedient * * *" On this subject this court, in the opinion in the case just cited, said:

"There is nothing in the statute quoted placing the corporate property of the county under the control and management of the board of supervisors which, in our opinion, changed the uses which might be made of the court house square. * * * The provisions of this statute must be construed with that contained in section 1, chapter 50 of the Code of 1849," (being the same statute as that aforesaid now contained in Code 1919, section 2854). " * * * By it the board of supervisors were * * * as was the county court, to plant with trees the residue of the court house lot not occupied with the court house, clerk's office and jail, and

to keep it as a place for the people of the county to meet and confer together. The duties imposed by this provision upon the board of supervisors are not discretionary but mandatory. They cannot make such use of the court house square 'as they may deem expedient' when the legislature has determined for what purposes and for what purposes only, it shall be used; for, as we have seen above, using it for any other purposes than those provided for by the legislature withdraws it to that extent from the uses to which the legislature has expressly dedicated it."

It will be observed that, while it is true, as stated in the majority opinion, the property in question in the case just cited was at one time used as a court house square, the decision of the case and what is said in the opinion of the court delivered by Judge Buchanan, does not rest upon the ground that the putting of the property to such use was at all necessary or in any way operated to dedicate it to the public use. On the contrary the opinion makes it plain that the statute (now Code 1919, section 2854, aforesaid), operated as a statutory dedication of the property to the public use.

That being true, as held by this court, notwithstanding the existence of a statute such as Acts 1878-9, p. 300, aforesaid, in conflict in its express terms with the statute, now Code 1919, section 2854; *a fortiori*, do I think, the same is true in the case before us, notwithstanding section 28 of the new charter of the city of Bristol, which by its express terms is not in conflict with the Code 1919, section 2854 statute.

As to the claim that the city did not need all of the Gauthier property for the purposes mentioned in the statute, Code 1919, section 2854, but only that part of it which was subsequently used for the rear end of the court house building and for the new street opened at that end of such building; and that the city council bought the residue of the

Gauthier lot only because it was forced to buy the whole lot for the reason that the vendor would not sell a part of it; this claim is based on the oral testimony of one of the members of the council and it is in conflict with the resolutions of the council on the subject, as they appear in the record copied from the minutes of the proceedings of that body.

The minutes of the proceedings of the city council aforesaid is the record which is required by express law to be kept in writing. Constitution of Virginia, sections 123 and 125; Code 1919, section 2985, following Acts 1902-3-4, pp. 412, 887; Acts 1908, section 88, pp. 456, 478; Code 1919, section 6193, following Code 1887, section 3331. Subject to certain exceptions which have no application to the case before us, the established rule is that parol evidence is inadmissible to contradict such a record in terms, or by adding thereto what does not appear from the record. *Page* v. *Belvin*, 88 Va. 985, 991, 14 S. E. 843; 2 McQuillin Mun. Corp., sections 623, 624, 625; 2 Dillon Mun. Corp., sections 555, 556, 557-8; 7 Am. & Eng. Ann. Cas., pp. 1045-6; *Sawyer* v. *Manchester*, 62 N. H. 135, 13 Am. St. Rep. 541, 543, 546, and note 550; 19 R. C. L., pp. 902-4. As said in *Page* v. *Belvin, supra*, (88 Va. at p. 991, 14 S. E. 843) : "These public bodies do what their acts show, and the testimony of the members cannot be received to impeach their recorded acts * * * If the ordinance was not such as the body passed, to repeal, amend, and re-enact are all the remedies, and they are ample for the ends of justice."

I think, therefore, that the parol evidence mentioned should be wholly disregarded by us and that the resolutions of the city council, as they appear of record, constitute the sole evidence which we can consider showing what was the action of such council.

Looking, therefore, to all the evidence in the case which can be looked to, I am forced to the conclusion that the

statute, Code 1919, section 2854, affected the whole of the Gauthier lot with the trust aforesaid at the moment it was acquired by the city and dedicated the whole of it to the public use for the purposes aforesaid of that trust. Since, upon the acquisition of such lot, the total holding of land of the city in that place did not exceed the statutory quantity of two acres, the mandate of the legislature, to the effect that the whole of it should be kept and used for the purposes named in the statute last named, supplanted and took away from the city council any discretion or right of exercise of judgment it might otherwise have possessed with respect to the need of the whole Gauthier lot for such purposes. It was not, as I think, left by the legislature as a question of public policy for the city council to decide. The legislature decided such question of public policy by its mandatory requirements aforesaid, and took that question away from the jurisdiction and from all authority of the city council.

The city council might have confined its action to purchasing, if it could, or if it could not, to condemning a part of the Gauthier lot; in which case only that part of such lot would have been affected with the public trust imposed by the statute, and would have been dedicated by the statute to the uses mentioned in such statute. But when the council went further and bought the whole lot under the authority of such statute, the statute, as it seems to me, operated as aforesaid as to the whole of it.