MONTGOMERY COUNTY, MARYLAND *v.*
MARYLAND-WASHINGTON METROPOLITAN
DISTRICT ET AL.

[No. 104, October Term, 1952.]

294

Decided April 22, 1953.

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*David Macdonald*, County Attorney for Montgomery County, with whom was *Joe M. Kyle*, Assistant County Attorney, on the brief, for the appellant.

*J. Bond Smith*, General Counsel, Maryland-National Capital Park and Planning Commission, and *H. Warren Buckler, Jr.*, for the Maryland-Washington Metropolitan District and the Maryland-National Capital Park and Planning Commission.

*Caesar L. Aiello,* with whom were *George E. Hamilton, Jr.,* and *James H. Pugh* on the brief, for The Most Reverend Patrick A. O'Boyle, Catholic Archbishop of Washington.

SOBELOFF, C. J., delivered the opinion of the Court.

This controversy is chiefly between two governmental bodies. Montgomery County seeks to recover a piece of land which it conveyed in 1944 to the Maryland-National Capital Park & Planning Commission, on the ground that the transfer was unauthorized, *ultra vires* and void.

The property, known as the "Armory Lot," is in Silver Spring. The County Commissioners of Montgomery County purchased it in 1931 for $75,000.00, with a portion of the proceeds from a bond issue authorized by Chapter 330 of the Acts of the General Assembly of that year. The enabling act provided that the borrowed money "shall be used exclusively . . . for the purpose of acquiring by purchase or condemnation a new site or additional land upon which to construct a new office building to house necessary offices of the County Commissioners, quarters for the Montgomery County Police and other necessary county activities, and . . . for the purpose of building or constructing such building."

Joined as one of the defendants in the Second Amended Bill of Complaint was The Most Reverend Patrick A. O'Boyle, Catholic Archbishop of Washington, whose predecessor in that office, The Most Reverend Michael J. Curley, had bought a small portion of the land from the Planning Commission. The Archbishop answered and moved for summary judgment on the pleadings. The motion was granted. A demurrer to the County's Amended Bill, filed on behalf of the Planning Commission, was sustained. The Bill of Complaint being thereupon dismissed as to all defendants, the County appealed.

In 1944, thirteen years after its acquisition, the Planning Commission by resolution requested the County Commissioners to convey the land to it for the establish-

ment of recreational facilities. The assent of the County Commissioners was given to the proposal in the form of a resolution. Therein the Commissioners provided among other things that if the Planning Commission were of the opinion that any of the land conveyed will not be needed for their plan of recreational use, such portion may be sold by the Planning Commission, provided only that the amount so received shall be applied either to the recreational improvements planned for this tract or to the purchase or development of other recreational parks. A deed unconditional in form was then executed and delivered by the County Commissioners to the Planning Commission and duly recorded on May 11, 1944. It recited a nominal consideration of "ten dollars and divers other good and valuable considerations."

It may be an aid to clarity to note briefly the principal statutory materials relied on by the parties in advancing their respective arguments. Then we shall deal with the various points and indicate our views.

1. There is first the loan authorization, Chapter 330 of the Acts of 1931, already mentioned.

2. In 1937, the General Assembly, enacted Chapter 155, now codified as Art. 25, Sec. 10, Annotated Code, 1951 Edition, which reads as follows:

   "The County Commissioners of each county and the legislative body of each incorporated city or town in the State shall have full power and authority to establish and/or maintain, directly or by contract, reasonable facilities for the public recreation."

3. In 1943, the General Assembly, by Chapter 1008, amended the law which created the Planning Commission in 1927; gave the Commission certain powers in respect to portions of the area of Montgomery and Prince George's Counties; provided for the issuance of bonds to be repaid by county taxation, the proceeds to be used by the Commission for specified purposes in these counties; provided also for proceeds of certain taxes levied by

these counties to be paid over to the Commission.

4. Art. 25, sec. 3 (b), the Annotated Code, 1951, conferring on Montgomery County the power to sell real or leasehold property no longer needed for public use (enacted in 1947).

5. Art. 25A, Annotated Code of Md., 1951 Edition, pertaining to the general powers of counties which avail themselves of the provisions of Art. 11-A of the Constitution of Maryland, by adopting a Charter. This includes a grant of power to dispose of any real or personal property no longer needed for public use. Montgomery County adopted a charter in 1948.

I. A preliminary point raised by the Planning Commission is that the County's remedy is at law in ejectment and that equity is without jurisdiction. We think it plain enough that when the County invokes the equity court's jurisdiction to enjoin conveyance of the land by the Planning Commission to a department store purchaser—a conveyance which the County alleges is immiment, a down payment of $10,000 having been made thereon—the equity court assuming jurisdiction for this purpose may retain it to adjudicate the entire matter. Moreover, the Archbishop's claims were also involved.

It has recently been declared that the requirement for resort to an action at law is not inflexible but that other factors, such as the need for mandatory injunction to afford complete relief, and to prevent a multiplicity of suits, may be taken into account. *Potomac Edison Co. v. Routzahn*, 192 Md. 449, 456, 65 A. 2d 580; *Southern Md. Agr. Asso. v. Meyer*, 196 Md. 31, 34, 75 A. 2d 89.

II. The briefs of counsel and their arguments in this Court centered chiefly upon the question of the effectiveness of Chapter 1008 of the Acts of 1943 to sustain the challenged conveyance by the County to the Commission.

The Commission sought to sustain the conveyance of the "Armory Lot" under the authority of this statute, while the County argued that the statute authorized grants of money only and in annual amounts considerably

less than $500,000 which the Bill of Complaint alleged
the land was worth in 1944. The conclusion we have
reached is that the case turns upon other points, and
most of the interesting contentions based upon Chapter
1008 need not be answered. It is sufficient here merely
to indicate the provisions of this statute, and to note
the arguments of the parties in respect to it.

For the purpose of establishing and maintaining recre-
ational facilities in that portion of the County where
the Commission operates, Chapter 1008 authorized the
Commission to issue bonds and the County to levy and
collect certain taxes to be transmitted to the Commission
and also to pay to the Commission one-half of the County's
share of the State's income tax and one-half of the profits
from the County Dispensary.

We turn to Subsection VII, Section 2, to consider the
contention of the County that Chapter 1008 does not
sanction a conveyance of land, but only grants of money.
The language of the statutory provision supports the
contention. It reads, "that the Boards of County Com-
missioners of both counties be and they are hereby au-
thorized from time to time to grant *monies* to the Com-
mission . . . not to exceed annually," etc. This follows
immediately after the provision for special tax levies.
We can no more disregard the clear limitation on the
form of the grant than the limitation on its amount.
Thus, if we look to Chapter 1008 for the needed authority
for the County to convey the land to the Commission,
we find that the authorization is clearly restricted, both
as to the amount of the grant and as to its form.

It is our conclusion that the conveyance of the prop-
erty in 1944 cannot, on the demurrer to the Second
Amended Bill, be upheld as an exercise of the authority
contained in Section 2, VII of Chapter 1008.

*III.* The Planning Commission advanced the further
argument that by Chapter 155 of the Laws of 1937,
Montgomery County, along with other political sub-
divisions of the State, was given authority by the Legis-
lature to provide recreational facilities "directly or by

contract" (Art. 25, Sec. 10, Annotated Code of Maryland, 1951 Ed.). If Article 25 was operative, it would seem to clothe Montgomery County with full authority to make provision by contract for recreational facilities without any limitation in amount or form. The County argued, however, that the Metropolitan District Act (Chapter 1008 of the Acts of 1943) which is a local law and is later than the general law (Art. 25), terminated the County Commissioners' authority to provide recreational facilities in the Metropolitan District. From this the County argues that in 1944 it was without authority to make a contract with the Commission for recreational facilities and the transfer of land in that year was unauthorized.

We do not accept the County's contention that the Act of 1943 ousted it of all authority to provide recreational facilities in the Metropolitan District. It is not unknown for more than one governmental body to exercise simultaneous jurisdiction in a particular territory, even in respect to the same subject matter, *Chicago Park District v. Lattipee,* 364 Ill. 182, 4 N. E. 2d 86. There is certainly no constitutional prohibition against the State designating more than one agency to operate in the same field. The wisdom of such an arrangement in a particular case may be debatable, as indeed it was debated by counsel in this case, but it is clear that if such an arrangement is made by the Legislature it cannot be set aside by the courts. The Washington-Suburban area, whose rapid growth was already in process a quarter of a century ago, induced the Legislature to create the Maryland-National Capital Park & Planning Commission and other bi-county agencies in the hope of assuring integrated planning and coordinated action in respect to public improvements in this expanding section of the State. Not only in the original enactment creating the Planning Commission, but in the various amendments made from time to time to this statute and to laws dealing more directly with the authority of the two counties, one can clearly discern the legislative

expectation that the counties and the Commission should function in harmonious cooperation. While subsequent events may create doubts as to the realization of this hope, certainly it had not been abandoned when the deed from the County to the Commission was made in 1944.

The two enactments are related. The Act of 1937 (Art. 25, Sec. 10) authorized the County to establish and maintain recreational facilities directly or by contract, without specifying a limit on the amount to be expended; while the Act of 1943 (Chap. 1008), dealing with grants of monies derived from taxes, imposes definite limits. If there were a conflict, we agree that the later local enactment would prevail over the earlier general law, Anno. Code of Md. (1951) Art. 1, sec. 13, but there is no conflict and both can be given effect.

*IV*. We now reach the principal question, which relates to the power of the County to convey land in the absence of authorizing legislation.

Despite statements of counsel at the hearing in this court and in the brief of an *amicus curiae*, that there had been some public use of the Armory Lot as a playground, the Bill of Complaint alleges no public use for the original purpose of an office building site or for a playground or any other public purpose. This, however, is not the real basis of the County's contention. Its actual contention is that when the lot was bought with the proceeds of a bond issue authorizing a site, building and furnishings for county offices, this was sufficient to constitute a holding in public trust. It is asserted that such a trust cannot be terminated by sale or otherwise even when the lot is no longer required for the intended purpose, without special legislative sanction.

In *10 McQuillin, Municipal Corporations*, par. 28.37, the general rule is laid down that land bought for a public use, if not actually so used, cannot be said to be affected by a public trust, and hence may be sold without special legislative authority. See *Kings Co. Inc. Co. v. Stevens*, 101 N. Y. 411, 5 N. E. 353; *Fussell-Graham-Alderson Co. v. Forrest City*, 145 Ark. 375, 224 S. W.

745; *Head-Lipscomb-McCormick Co. v. City of Bristol,* 127 Va. 669, 105 S. E. 500; and cases cited by *McQuillin.*

The appellant relies on the case of *Worcester Electric Co. v. Hancock,* 151 Md. 670, 135 A. 832, but it is readily distinguishable, for there the town of Snow Hill was declared without power to convey, in the absence of specific authority, an electric plant which it had contracted to purchase and which was in actual operation under municipal auspices in the public service of the community. Snow Hill did have a general charter power to convey. The opinion in the *Hancock* case emphasized that the property had been dedicated to public use and the town was in actual operation of the electric plant.

Determining, as we must for the purposes of this demurrer, that the property is to be regarded as not being held as a trust for public use, does not necessarily answer the question as to what, if any, legislative authority is required to convey. Pursuing the inquiry further, we find that a county may hold property in either of two capacities, one being governmental and the other proprietary. A distinction is frequently drawn between property held by a county in its proprietary capacity and that held by it in its governmental capacity. Property which is held in a governmental capacity or is impressed with a public trust, cannot be disposed of without special statutory authority. *Worcester Elec. Co. v. Hancock, supra; Buckhout v. City of Newport,* 68 R. I. 280, 27 A. 2d 317, 141 A. L. R. 1440; *Southeastern Greyhound Lines, Inc. v. City of Lexington,* 299 Ky. 510, 186 S. W. 2d 201; *San Diego County v. Calif. Water & Telephone Co.,* 30 Cal. 2d 817, 186 P. 2d 124, 175 A. L. R. 747. But as to property held in a proprietary capacity and not dedicated to public use, or impressed with a trust, the rule is otherwise. We treat now of the question as to what, if any, property a public corporation has power to dispose of in the absence of both general and specific statutory authority.

In Maryland the precise question has not arisen, but this Court has often indicated the correct approach to

questions concerning county powers. In *Frederick Co. v. Page*, 163 Md. 619, 164 A. 182, it was said: "The County Commissioners are a governing body with limited powers. They can exercise only the authority with which they have been expressly, or as a reasonable implication, invested by law." Citing, *Peter v. Prettyman*, 62 Md. 566, 571; *Tasker v. Garrett Co. Commissioners*, 82 Md. 150, 153, 33 A. 407.

Some of the authorities cited relate to municipal corporations rather than counties, but these are in point, for, in *Neuenschwander v. Wash. San. Com.*, 187 Md. 67, 48 A. 2d 593, this Court said: "The Maryland Legislature has declared the county commissioners of every county in the State to be a corporation (Code, 1939, Art. 25, Sec. 1) and the Court of Appeals considers them to be a municipal corporation. *Talbot County Com'rs. v. Queen Anne's County Com'rs.*, 50 Md. 245, 249; *Gordon v. Com'rs of Montgomery County*, 164 Md. 210, 213, 164 A. 676; *Maryland Racing Commission v. Maryland Jockey Club*, 176 Md. 82, 87, 4 A. 2d 124, 479. Cf. *Clauss v. Board of Education of Anne Arundel County*, 181 Md. 513, 30 A. 2d 779."

The same rule is declared by *Dillon*, at Sec. 237 of his second volume on *Municipal Corporations*: "It is a general and undisputed proposition of law *that a municipal corporation possesses and can exercise the following* powers, and no others: First, those granted in *express words*; second, those *necessarily or fairly implied* in or *incident* to the powers expressly granted; third, those *essential* to the accomplishment of the declared objects and purposes of the corporation,—not simply convenient, but indispensable." See also *Spaulding v. Lowell*, 23 Pick. (Mass.) 71, 74.

But with full recognition of this principle, the same author, in *III Dillon* (5th Ed.) 1581, in regard to a municipal corporation's power of alienation of its property states: "Municipal corporations possess the *incidental or implied right to alienate* or dispose of the property, real or personal, of the corporation of a *private*

*nature,* unless restrained by charter or statute; they cannot, of course, dispose of property of a *public nature,* in violation of the trusts upon which it is held, and they cannot, except under valid legislative authority, dispose of the public squares, streets, or commons."

To the same effect, is *McQuillin,* in vol. 10 of his work on *Municipal Corporations,* in sec. 28.37: "Otherwise stated, where there is no statute or charter provision, the general proposition has often been asserted that a municipal corporation possesses the power to dispose of any property which it has a right to acquire. 'Independent of positive law, all corporations have the absolute *jus disponendi* of lands and chattels, neither limited as to objects, nor circumscribed as to quantity.' * * * Indeed, so necessarily incidental is this power that it has been holden that a corporation cannot be created possessing the power of holding, without the power of disposing; and that a clause in the charter, restricting the alienation of their property, without consent of the chancellor, is void. * * *

"These general expressions, however, are reducible to the proposition that all property of the municipal corporation of a private nature may be sold. But the chief authority for this point of view is the public interest. While it is a recognized rule of the common law that municipal corporations may, insofar as they possess private rights, dispose of their property without special authority from the state, this limitation exists: That property possessed and used by municipal corporations as public agencies of the state for the purpose of governmental administration cannot be alienated by them without special authorization. All property held by the city in fee simple, without limitation or restriction as to its alienation, may be disposed of by the city at any time before it is dedicated to a public use. In other words, the city has the right to sell or dispose of property, real or personal, to which it has the absolute title, and which is not affected by a public trust, in substantially the same manner as an individual unless re-

strained by statute or charter; and this power is an incidental power inherent in all corporations, public or private." See *Kings County Fire Ins. Co. v. Stevens, supra; People v. City of Albany,* 4 Hun, N. Y., 675; *Southeastern, etc., Inc. v. City of Lexington, supra; Fussell v. Forrest City, supra; Lester v. Walker,* 177 Ark. 1097, 9 S. W. 2d 323.

A few jurisdictions hold that in the absence of legislative authorization there is no implied power of a municipal corporation or county to convey real estate held in a proprietary capacity not subject to a public use. They are definitely in the minority. See *Williams v. Wylie,* 217 S. C. 247, 60 S. E. 2d 586, 21 A. L. R. 2d 717; *Gessner v. Del-Air Corp.,* 154 Fla. 829, 17 So. 2d 522.

With respect to the County's contention that it was without power to dispose of its real estate we find, in accordance with the majority view, that the County, by making the disputed conveyance, did not act *ultra vires.*

V.  Nevertheless, an implied power to sell property is not an implied power to make a donative disposition. Consequently, the disposition, unless there is consideration for it, is an *ultra vires* act because there is no statutory power enabling the County to make a gratuitous disposition, and it has no such implied power. We must turn again to Art. 25, Sec. 10, which authorizes the County Commissioners * * * "to establish and/or maintain, directly or by contract, reasonable facilities for the public recreation." This clearly empowers the County to contract for recreational facilities and the Planning Commission, a state instrument possessed of authority to establish such facilities, is an appropriate agency for this purpose.

It is the Planning Commission's contention that its resolution and that of the County, made in 1944, respectively containing an offer and an acceptance, gave rise to a valid contract, the consideration for which was the Commission's agreement to establish recreational facilities either upon the land conveyed or other land, to be purchased with the proceeds of sale of the former,

in the event it was sold.   With this we are in accord.

The form of the engagement between the County and the Commission is unexceptionable. That a public corporation may make a contract by resolution is a proposition for which there is ample authority.   *Illinois Trust & Savings Bank v. Arkansas City,* 8 Cir., 76 F. 271, 34 L. R. A. 518; *10 McQuillin,* sec. 29.10 (citing numerous authorities).

There being a valid consideration to support the conveyance made by virtue of the County's implied power to dispose of the Armory Lot, it follows that the deed to the Commission was valid and it passed a title which now cannot be assailed.

As to the Archbishop, his title is as clear as his grantor's.

*Order affirmed, with costs.*