MARYLAND RACING COMMISSION ET AL. v. MARYLAND JOCKEY CLUB.

[No. 91, October Term, 1938.]

*Decided February 1st, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, and JOHNSON, JJ.

*Hilary J. Gans, Deputy Attorney General,* with whom was *Herbert R. O'Conor, Attorney General,* on the brief, for the Maryland Racing Commission, appellants.

*Randolph Barton, Jr.,* with whom was *James P. Kelley* on the brief, for the County Commissioners of Baltimore County, appellants.

*Stuart S. Janney* and *Frank B. Ober*, with whom were *Ritchie, Janney, Ober & Williams* on the brief, for the appellee.

SLOAN, J., delivered the opinion of the Court.

The Maryland Jockey Club, which operates the Pimlico Race Track in Baltimore City, has filed a bill to restrain the imposition and collection by the State Racing Commission of a daily license fee of $3000 for every day of racing permitted, in addition to the license fee of $6000 per day, exacted of or imposed on all one-mile tracks in the state, the additional license fee now made payable by the Racing Commission to the Treasurer of Baltimore County, in accordance with the provisions of chapters 89 and 264 of the Acts of 1918, and the same as amended by chapter 273, section 1, subdivision 8, of the Acts of 1920, the latter section 8, article 78B, of the Code of Public General Laws.

Prior to 1918 horse racing in Baltimore County was under the control of a board appointed by the Governor (Act of 1912, ch. 77), known as the "Baltimore County Racing Commission," and one of the tracks within its jurisdiction was the plaintiff's track at Pimlico. By the Act of 1918, ch. 82, certain portions of Baltimore and Anne Arundel counties were annexed to Baltimore City, and in the territory of Baltimore County so annexed the Pimlico Race Track was located, from the owner of which, the Maryland Jockey Club, Baltimore County had been collecting an annual license fee of $3000 for every day of racing at that track. Act of 1918, ch. 89.

The Act of 1918, ch. 264, provided (section 1) : "That nothing contained in the Act of the General Assembly of 1918, entitled 'An Act to Extend the Limits of Baltimore City by Including Therein Parts of Baltimore County and Anne Arundel County,' shall operate to affect any race track or racing or the jurisdiction of any racing commission or the rights and powers of said commission or its licensees within the limits defined by the said Act; it being the intent of this Act that such race tracks and

the racing thereon shall continue to be subject to the jurisdiction of the present Racing Commission of Baltimore County and be governed only by the laws in existence prior to the first day of January, 1918, including such Acts of the General Assembly concerning race tracks and racing applicable to the Racing Commission of Baltimore County, as may be passed by the present General Assembly; and by such laws as may hereafter be enacted; —provided that all license fees collected by said Racing Commission of Baltimore County shall be applied to the same purposes [roads and two agricultural associations, Act of 1918, ch. 98] as are now prescribed by the laws applicable to said Racing Commission of Baltimore County, including any amendments thereof passed at the present session of the General Assembly." Section 2 made this Act effective one day after the Annexation Act should take effect.

By the Act of 1920, ch. 273 (Code, article 78B), the Racing Commission of Baltimore County was abolished, and the Maryland Racing Commission was created, with jurisdiction over all racing for purses in the state, and by section 8 it was provided that the license fee prescribed in section 432 of the Public Local Laws of Baltimore County, as amended by the Act of 1918, ch. 89, shall be paid by the Maryland Racing Commission to "* * * the Treasurer of Baltimore County for the uses and purposes described in Section 435 of the Revised Code of the Public Local Laws of Baltimore County, Edition of 1916, as said Section 435 was amended by Chapter 89 of the Acts of 1918."

The plaintiff has paid this license fee every year since 1918 until 1938, when it filed its bill to enjoin the members of the Maryland Racing Commission, (1) from demanding or collecting more than $6000 for the issuance of a license to it for the dates allotted; (2) from refusing a license unless or until the additional $3000 a year be paid; and (3) commanding the Commission to issue the license upon the payment of $6000 per day for each of said days of racing.

The original defendants, together with the County Commissioners of Baltimore County, allowed to intervene as party defendant, demurred to the bill of complaint. The demurrers were overruled, with leave to amend in ten days. The defendants declined to answer further, when a decree was passed directing the injunction to issue as prayed, from which the defendants appealed.

It was not argued before the chancellor, nor here, that the tax was discriminatory, or because in excess of the license fee exacted of the three other mile tracks in the state; nor was there any question of procedure, that is whether the remedy should be by mandamus or injunction. Code, art. 5, sec. 10. The question is whether the Legislature can require the payment of this additional license fee, whether directly or indirectly payable to one political subdivision of the state, by a person or corporation to operate a business located in another political subdivision. There is no contention that the license and regulation of racing is not within the police power of the State.

The plaintiff contends that it is a tax imposed on a business in one locality for the benefit of another, while the defendants contend that it is a license fee imposed and collected by the State, and that the State can pay or appropriate it to any purpose or object within the state which is not unlawful. The difference in the contentions of the plaintiff and defendants is that the former insists that the additional fee is a tax, and as such is illegal, and of the latter that it is a license fee imposed by the State, as a condition precedent to the right to conduct racing on a mile track in the annexed territory. The implications of the plaintiff's argument are that there could be no valid objection to the tax or license fee if it all went to and was retained by the State. The authority in this state upon which the plaintiff most strongly relies is from the opinion in *Talbot County Commrs. v. Queen Anne's County Commrs.*, 50 Md. 245, where it is said: "A county is one of the public territorial divisions of the

State, created and organized for public political purposes connected with the administration of the State Government, and especially charged with the superintendence and administration of the local affairs of the community; and being in its nature and object a municipal organization, the Legislature may, unless restrained by the Constitution or some one or more of those fundamental maxims of right and justice with respect to which all governments and society are supposed to be organized, exercise control over the county agencies, and require such public duties and functions to be performed by them as fall within the general scope and objects of the municipal organization. It is true, the power of the Legislature over these municipal organizations is not without limit, under the Constitution of this State, and especially is there a limit in regard to objects dependent upon the exercise of the power of taxation. This limitation is implied from the very nature and objects of the organization. As applied to these subdivisions of the State, the Legislature has no more power to require a tax to be raised in one county to pay for a purely local object in and for another county, than it has to require that the expenses of a purely public improvement should be paid by one or a given number of individuals." *Brooks v. Baltimore,* 48 Md. 265; *Baltimore City v. Allegany County Commrs.,* 99 Md. 1, 7, 57 A. 632; *Appeal Tax Court v. Patterson,* 50 Md. 354; *Baltimore & Eastern Shore Railroad Co. v. Spring,* 80 Md. 510, 31 A. 208; 1 *Cooley on Taxation* (4th Ed.), 337. The case arose from an application by the County Commissioners of Queen Anne's County for a writ of mandamus to compel the County Commissioners of Talbot County to comply with the provisions of the Act of 1876, for the maintenance and construction of a draw-bridge over the channel of Kent Narrows, located wholly within Queen Anne's County, one-half of the cost of erection to be borne by each county, and thereafter to be under the control of the County Commissioners of Queen Anne's County. The Act was upheld because of the benefit which would accrue to Tal-

bot County. While the quotation from *Talbot County Commrs. v. Queen Anne's County Commrs., supra,* aptly expresses the plaintiff's contention, the decision implies that there may be an exception where the county paying the tax also receives the benefit of the object of taxation.

The defendants rely on the distinction between a direct tax levied on property in Baltimore City to be paid to Baltimore County, which both sides agree would be unlawful, and a license or privilege to engage in a business, in this case the business of horse-rasing, the regulation and licensing of which is within the police power of the State. There is no virtue in the defendants' argument that this is a license and not a tax. It is a tax. *Rohr v. Gray,* 80 Md. 274, 30 A. 632; *LeLoup v. Port of Mobile,* 127 U.S. 640, 8 S.Ct. 1380, 32 L.Ed. 311; 2 *Bouvier* (Rawle's Third Rev.), page 1976.

It is not a tax on property which falls on all owners alike, but a tax on a business, which would apply to all race track owners in the territory of Baltimore County annexed to Baltimore City by the Act of 1918, ch. 82. *Corson v State,* 57 Md. 251; *Havre de Grace v. Johnson,* 143 Md. 601, 123 A. 65; *Jewel Tea Co. v. Bel Air,* 172 Md. 536, 538, 192 A. 417. It just happens that Pimlico is the only mile track in that territory, but there might be others, and if so they would be subject to this tax. The difference between this tax and that on real and personal property is that the property must pay regardless of the ownership, while the business man can decide whether he will continue in business or not, and thus decide whether there will be a tax or no tax, with the license or business tax, if the decision is to remain or continue in business, payable in advance.

The three thousand dollars excess fee exacted in this case from the plaintiff must, therefore, be regarded as a tax, and the question then is whether its diversion to Baltimore County for the purposes specified is lawful. If the Act of 1920. ch. 273, sec. 1, subd. 8, had provided for the payment of any part of the whole license tax, $9000, directly to Baltimore County, it would have offended

against the rule as stated in *Talbot County Commrs. v. Queen Anne's County Commrs., supra,* that the property and persons of one county or city cannot be taxed by another county or city, either by legislative or any other kind of authority. But the contention of the defendants here is that the additional or excess license fee or tax exacted of one mile tracks in the annexed territory (Act of 1918, ch. 82) is paid to the State of Maryland under the authority of section 1, subdivision 8, of the Acts of 1920, ch. 273, and by the same Act is appropriated by the State to Baltimore County for the purposes specified by the Act of 1922, ch. 481 (Local Code, art. 3, sec. 549), and relies on a statement of this court in *State v. Applegarth,* 81 Md. 293, 304, 31 A. 961, 963, that "If the state has the right to impose the license tax, as we hold it has, it can certainly determine what shall be done with the money, as long as no unlawful use is made of it," and there is no charge made here that the uses to which the money is to be applied are unlawful. It may be said that this statement is *obiter* because of the difference in the facts of that case and this, but there are enough points of similarity to apply that rule here, so it will hereafter have the force of judicial decision. It was cited and quoted in *Foote & Co. v. Stanley,* 117 Md. 335, 347, 82 A. 380. That case was reversed by the Supreme Court of the United States in 232 U.S. 494, 495, 34 S.Ct. 377, 58 L.Ed. 699, on the ground that the oyster inspection Act of 1910, ch. 413, imposed such fees in excess of the public need as to impose a burden on interstate commerce, but otherwise the decision stands.

The license tax here imposed takes nothing away from Baltimore City, for, if the part payable to Baltimore County were taken away, it would not, without legislative authority, go to Baltimore City. Racing is a sport licensed by the State *(supra),* the fees for which go to the State, as do practically all revenues from licenses, except those collected by municipalities, and are disbursed as directed by the General Assembly. Some of it goes into the general funds, while others, such as the automobile

licenses and registration, are ear-marked. In this case, one-third ($3000) of the daily license fee or tax collected from the plaintiff is appropriated by the General Assembly to Baltimore County (Acts of 1918, chs. 89, 264; Acts of 1920, ch. 273, sec. 1, subd. 8), which we find to be a valid exercise of legislative power.

The decree will be reversed, the injunction dissolved, and bill of complaint dismissed.

> *Decree reversed with costs, injunction dissolved, and bill of complaint dismissed.*

PARKE, J., filed a dissenting opinion as follows, in which JOHNSON, J., concurred.

The sole question in the instant appeal is the constitutionality of a particular provision of the statutory law imposing an additional license or occupation tax upon one of the same class of operators of tracks for the racing of horses within the State of Maryland. While the question is single, the correct answer may be found on two different grounds. The court must declare the law in every case, and so it must enforce the Constitution as the paramount law whenever a legislative act is found to be in conflict. The parties, therefore, may not by their election confine the court in its consideration of the question of constitutionality to the determination of the validity of but one ground of objection where several exist. *Baltimore v O'Conor,* 147 Md. 639, 654, 128 A. 759, 40 A.L.R. 1058; *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60.

The writer dissents in the conviction that the additional license tax is unconstitutional for the reasons that it is discriminatory and unlawful because of the interdiction of organic law and the provisions of the Fourteenth Amendment of the Constitution of the United States, and of the twenty-third article of the Declaration of Rights of the Constitution of Maryland. It is submitted that the statute unreasonably discriminates against one member of a class by arbitrarily imposing upon that member an additional license or occupation tax which is not imposed upon any other member of the class; and, for the local

and exclusive benefit of another and distinct political division, illegally lays this additional tax upon that member because of the location of the member's track for racing within a part of one political division of the State.

On March 29th, 1918, chapter 82 of the Acts of 1918 was approved. By this enactment, which is known as the "Annexation Act of 1918," certain parts of Baltimore County were incorporated with Baltimore City. In the area thus acquired is located the race track at Pimlico, which is owned and operated by a private corporation. Horse racing at Pimlico had long continued, and at the time of the annexation was subject to the provisions of the local laws in force in Baltimore County. By the express terms of the Annexation Act, the provisions of the Constitution of Maryland, the Charter of Baltimore City, and all local laws applicable to Baltimore City, and all the ordinances of that municipality, were extended and made applicable to those portions of Baltimore County which were annexed, and the local laws of Baltimore County, except as by the statute otherwise provided, were repealed so far as the annexed territory was concerned. Acts of 1918, ch. 82, sec. 2. Among the effects of this statute was that to render inoperative the local laws of Baltimore County with respect to racing at Pimlico and at any other place within the area annexed to Baltimore City. The provisions of the statute became operative on June 1st, 1918.

At the same session of the General Assembly, the local laws of Baltimore County relative to racing were amended by chapter 89, which was approved on April 3rd, 1918, a few days later than the approval of chapter 82, but which went into effect on the same day. The statute amended sections 429, 432 and 435 of the Revised Code of Public Local Laws of Baltimore County, Edition of 1915, as legalized by chapter 16 of the Acts of 1916, title "Racing Commission." In brief, the statute imposed a license fee of $75 for every day of racing up to five days, and $3000 a day for every additional day, unless the races were run on a mile track or a track of over a half mile,

when the license fee was $3000 for every day of the racing period. The Baltimore County Racing Commission was required to pay its limited expenses out of these license fees and to disburse the surplus in this manner: Two-thirds of the surplus were to be paid by the Commission to the Treasurer of Baltimore County to be used and expended in the construction or maintenance of the public roads and bridges located in Baltimore County, as the County Commissioners of Baltimore County may determine, but, first, "to the reconstruction of the Hanover turnpike road between Reisterstown and the Carroll County line; and, second, to the construction and improvement of the Dulaney's Valley turnpike road northwest from Towson." The remaining one-third the Commission was required to divide equally and to pay one-half thereof to the Maryland State Fair and Agricultural Society of Baltimore County, and the other one-half to the White Hall Farmers Club and Improvement Associations, "for the purpose of encouraging an increased and improved exhibition of farm products at the agricultural fairs held annually at Timonium and White Hall," which are both within the present limits of Baltimore County. The statute was a local public law, and was effective within the limits of Baltimore County, as reduced by the Annexation Act of 1918. The statute, therefore, had no extraterritorial effect, and did not apply to the annexed territory, within which was the Pimlico race track.

Under these legislative circumstances the same General Assembly passed a later statute, which was approved on April 24th, 1918, but became effective on the day after the Annexation Act of 1918 (Acts of 1918, ch. 82) became effective. This last of the three is chapter 264 of the Acts of 1918, and purports to be a supplemental statute to the Annexation Act, and its purpose was to incorporate in the Annexation Act the local statutes of Baltimore County with reference to racing, so as to make them applicable and operative within that portion of Baltimore County which had been incorporated in Baltimore City by the Annexation Act of 1918. The General Assem-

bly declared that no provision of the Annexation Act should affect any race track or racing or the jurisdiction of any racing commission or the rights and powers of said commission or its licenses within the limits defined by the Annexation Act, but that such race tracks and the racing therein shall continue subject to the jurisdiction of the present Racing Commission of Baltimore County, and be governed only by the laws in existence prior to the first day of January, 1918, including such Acts of the General Assembly, concerning race tracks and racing applicable to the Racing Commission of Baltimore County, as may be passed by the present General Assembly, and by such laws as may be hereafter enacted, and that all license fees collected by the Racing Commission of Baltimore County shall be applied to the same purposes as are now prescribed by the laws applicable to said Racing Commission of Baltimore County, including any amendments thereof passed at the present session of the General Assembly.

The effect designed was to have the local laws of Baltimore County with respect to race tracks operative within that area of Baltimore County which had been acquired of Baltimore County, and not only to commit administration of those local laws within the City to the Baltimore County Racing Commission, but to assure to Baltimore County the full benefit of the license fees for the local purposes of Baltimore County. The anomalous situation of a board of county officials having control, and acting in an administrative capacity, with respect to horse racing on tracks wholly within a portion of the territory of a distinct political unit, and performing its duties independently of the latter's jurisdiction and municipal officers, continued until the change made by the succeeding session of the General Assembly.

By the Acts of 1920, ch. 273, the General Assembly undertook to regulate, control, and license horse racing within the State of Maryland, and for this purpose it created a Maryland Racing Commission, and provided its powers and duties. It was approved on March 31st, 1920,

and became effective on June 1st of that year. Code, art. 78B, title "Racing Commission," secs. 1-17. The statute prohibited within the state all horse racing at any meeting for any stake, purse, or reward, except it be licensed by the Commission. Section 6. It further forbade the issuance of permits and licenses for such meetings unless, on the tracks or places for holding races, there had been run or held meetings for racing at least once in every year for a period of three consecutive years before the enactment. The purpose of this provision was to confine racing to existing courses. Section 7 (Acts of 1937, ch. 408).

The license fee for every day given to racing was $6000, but the statute declared that it in nowise repealed the provisions of chapter 264 of the Acts of 1918, except that the Maryland Racing Commission should be substituted for the Racing Commission of Baltimore County mentioned in chapter 264, and should be paid and entitled to receive the license fee prescribed by chapter 89 of the Acts of 1918, and should pay such license fee to the Treasurer of Baltimore County for the purposes as set forth in section 435 of the Revised Code of Public Local Laws of Baltimore County, Edition of 1916, as said section was amended by chapter 89 of the Acts of 1918. Section 8 (Acts of 1937, ch. 408. Compare Acts of 1922, ch. 481). In addition to these license fees, an additional "license fee or tax" of fifteen per centum of the net revenue of a licensee was imposed by section 12.

These provisions are sufficient to present the questions on this record, and no more need be stated except that the statute contains a provision that the unconstitutionality and nullity in whole or in part of any paragraphs shall not affect the validity of the remaining paragraphs or parts of paragraphs, which are to remain in full force and effect. The final section of the Act (section 3) repeals all inconsistent laws.

Under a separate section of chapter 273, the Racing Commission was authorized to license county fairs or agricultural exhibits, for a few days in every year. A

license fee of $50 a day is exacted and the fee received is directed to be paid to the treasurer of the county in which the fair or exhibit may be held. Section 13 (Acts of 1935, ch. 255; 1936, 1st Special Session, ch. 136; and 1937, chs. 64, 408).

Additional revenue is obtained through chapter 324 of the acts of 1933, known as section 12A of article 79B, Code Supp. 1935. By this legislation a tax is laid at the rate of one per centum on the total amount of money wagered on all races during every meeting, except that of a county fair or agricultural exhibit. The Racing Commission is paid this separate tax, which is transmitted to the Treasurer of Maryland. Code (Supp. 1935), art. 78B, sec. 12A (see Acts of 1937, chs. 64, 408).

Several of the sections of chapter 273 of the Acts of 1920 have been amended, as the parenthetical references to statutes heretofore noted indicate, but the modifications thus made do not require a particular statement, because they do not change the problem presented by the original petition.

The controversy involves the rights of a legal person in relation to its property, since private corporations are "persons" within the meaning of the Fourteenth Amendment, so far as their rights of property are concerned, and are entitled to the equal protection of the law (*Grosjean v. American Press Co.*, 297 U.S. 233, 244, 56 S.Ct. 444, 80 L.Ed. 660; *Liggett Co. v. Baldridge*, 278 U.S. 105, 49 S.Ct. 57, 73 L.Ed. 204; *Smyth v. Ames*, 169 U.S. 466, 522, 18 S.Ct. 418, 42 L. Ed. 819; *Covington & L. Turnpike Road Co. v. Sandford*, 164 U.S. 578, 592, 17 S.Ct. 198, 41 L.Ed. 560); and the right to conduct their lawful business equally with others of the same class is a property right. *Truax v. Corrigan*, 257 U.S. 312, 327, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375; *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 465, 41 S.Ct. 172, 65 L.Ed. 349; *Liggett Co. v. Baldridge*, 278 U.S. 105, 111, 49 S.Ct. 57, 73 L.Ed. 204.

It is admitted that the only reason the license was not issued to the plaintiff was that it had declined to pay the

additional license tax of $3000; and that if and when paid the license would forthwith be granted. If the imposition of the additional tax is invalid on constitutional grounds, the refusal of the Commission to issue the license was unwarranted, and denied the plaintiff the right to conduct its business, and, so, a property right is here involved.

With the history of the provisions of the statutory law now in force kept in mind, and the incidence of those provisions upon the right of the plaintiff to carry on its lawful business known, the next inquiry relates to the nature of the license tax or fee.

The purpose of the statute at bar is not only to secure revenue but also to limit the number of licenses, and to regulate the exercise of the privilege when granted. The last two objects are attained by the requirement that certain preliminary conditions to the issue of the license are fulfilled and by the subsequent regulation of the enterprise through the instrumentality of an official commission. Thus the license fee or tax created is both an occupation or privilege tax and a revenue measure. Whether the fee of $6000 exacted for every day of the races during the meetings is primarily for revenue purposes, since it is obviously so much in excess of the amount necessary to cover the actual expenses of issuing the license and of regulating and controlling the racing, is not necessary to decide. It, however, would be indisputable that the revenue obtained from the $6000 fee "is none the less legal because the ordinance, which authorized it fulfills the two functions, one a regulating and the other a revenue function." *Royall v. Virginia,* 116 U.S. 572,, 579, 6 S.Ct. 510, 29 L.Ed. 735, 737; *Crowley v. Christensen,* 137 U.S. 86, 11 S.Ct. 13, 34 L.Ed. 620. However, the basic daily charge or tax of $6000 is so excessive for a licensing and regulatory purpose that the charge would generally be regarded as primarily a tax for revenue and not a license tax. Unquestionably the addition to the universal daily basic rate of $6000 of the daily sum of $3000 that the statute attempts to lay upon meetings for racing within a defined

area and requires to be paid, without reduction, to the Treasurer of Baltimore County, is simply and wholly a revenue tax, which has no relation nor ascription to an exercise of the police power. Since the provision here under consideration is primarily the imposition of a tax for revenue purposes, the amount of the tax is wholly within the discretion of the Legislature, but if it were laid in the exercise of the police power, the reasonableness of the exaction would not be barred from judicial review. 37 *C.J.*, sec. 49, pp. 196-197; *Cooley on Taxation* (4th Ed.), sec. 27, pp. 98-99; sec. 29, p. 102. See *Vansant v. Harlem Stage Company,* 59 Md. 330, 335, 336; *State v. Rowe,* 72 Md. 548, 552, 20 A. 179; *State v. Applegarth,* 81 Md. 293, 300, 31 A. 961.

Within its discretion, the Legislature has generally the power to impose a fixed license tax or fee upon all who are engaged in a certain occupation or business. The amount of the license may be determined according to the value of the stock or capital employed; or by the receipts or income; or to the population of the political unit where the business is conducted; or, if a corporation, to its capital stock or assets. The amount of this license fee or tax may usually be increased or decreased by the legislative will. It is further true that the increase may be made with reference to a particular class of those engaged in an occupation or business. Again, the amount or rate of the tax may be graduated within a political unit with reference to its sub-divisions; and the license fee or tax may, at the discretion of the Legislature, be made inoperative within designated political units. All these general observations are necessarily subject to the qualification that the tax must not violate the provisions of the federal or a state constitution.

It is further true that the constitutional mandate that taxation shall be equal and uniform refers primarily to the taxation of property, and does not apply in its full force to the laying of a license tax on a business or vocation. *State v. Applegarth,* 81 Md. 293, 31 A. 961; 12 *Am. Juris.*, secs. 485-494, 505, pp. 163-176; 187. However,

under the Fourteenth Amendment of the Federal Constitution, which prohibits the denial of equal protection of the laws, and the similar provision of article twenty-three of the Declaration of Rights of the State of Maryland, the license taxes laid must bear equally and uniformly on all persons and subjects embraced in the same class, and under similar conditions and circumstances. *Oliver Iron Mining Company v. Lord*, 262 U.S. 172, 43 S.Ct. 526, 67 L.Ed. 929; 37 *C.J.*, sec. 53, p. 201; *Whaley v. Northern Road Impr. Dist.*, 152 Ark. 573, 240 S.W. 1; *State v. Shaughnessy*, 47 Nev. 129, 217 P. 581; 12 *Am. Juris.*, secs. 477, 478, 480, pp. 142-151, sec. 518, pp. 207-211.

The license tax is imposed by legislation which is made state-wide in its operation and is not confined to any one or more of the subordinate political divisions of the state. The terms which identify and define the class of persons and subjects within the purview of the law are uniform, universal and reasonable in their application. No member of the class is defined in terms of political geography. The admission made by the demurrer is that there are but four members of the class in the entire state. Their several racing meetings are at Bowie in Prince George's County; at Havre de Grace in Harford County; at Laurel in Anne Arundel County; and at Pimlico, which is now in Baltimore City, but before the Annexation Act of 1918 was in Baltimore County. Every one of these is required by the law to pay the identical license fee of $6000 for every day of racing. Every one of these members possesses the common requisites of the statutory class, and none of these requisites has any territorial relation other than that the member conduct racing within the state. The equal and uniform incidence of the license tax is, however, destroyed with reference to the owner of the track for racing at Pimlico, which has imposed upon it an additional license tax of $3000 a day during its meetings for racing, which the State Racing Commission collects but pays, without diminution, to Baltimore County, which uses the fund for local purposes. The reason for

this additional burden is apparently that the race track at Pimlico was within the limits of Baltimore County before it became incorporated in Baltimore City by the Annexation Act of 1918. The effect of this particular provision is to make the license or occupation tax $9000 for every day of racing upon a race track of a specified length and user within that portion of the present area of Baltimore City which was a part of the territory of Baltimore County at the time of the Annexation Act of 1918; and $6000 a day, if such a race track be within (a) any other part of the existing territory of Baltimore City or (b) any other place within the State of Maryland. As there is racing at Pimlico in the spring and fall, the discrimination mounts to a large sum of money every year. There is nothing in the history and form of the legislation which relieves this license tax of its unreasonable and arbitrary discrimination. If, as argued, the additional imposition of $3000 a day for every one of racing is attributable to the superior advantage in location of Pimlico, so far as ease of access and density of population and the financial resources of its patrons are concerned, the legislation does not supply a basis for such a rationalization. The object of the super-license tax was clearly designed for the local benefit of Baltimore County. The intention was to secure to that political sub-division a continuation of the license tax on racing which the county had previously received from tracks within the portion of the county which had been annexed to Baltimore City by the Acts of 1918. The declared purpose of the General Assembly was that the race tracks within the area annexed, and the racing thereon, "shall continue to be subject to the jurisdiction of the present Racing Commission of Baltimore County" and that the license tax of $3000 be paid to the County. Acts of 1918. The license-tax under the Acts of 1920 applied throughout the entire state without reference to the location of the race tracks affected in respect of any political sub-division. Advantage in location, because of proximity to large centers of population, and the patronage of a superior quality of

race-goers, were evidently not considered. The primary license fee or tax is the same, whether at Bowie or Havre de Grace, which are patently the less advantageously located tracks, or at Pimlico or Laurel, which are the more favorably situated tracks, since the first is now in Baltimore City and the second lies between the cities of Baltimore and Washington and both are readily accessible to the patrons of either metropolis. It should further be observed that the legislation negatives by implication the inference that the surtax is imposed because of any superiority in the location of the tracks in Baltimore City, since this advantage would exist no matter where the prescribed kind of tracks for racing were conducted within the limits of Baltimore City, but the law, nevertheless, lays the surtax only on race meetings in that portion of the area of Baltimore City which was taken by annexation from Baltimore County in 1918. Such a preferential inequality demonstrates beyond question that the discrimination made has no reasonable relation to advantages of location or of population.

The intention of the lawmakers is ascertained by the meaning of the language used in the statute, and not by what the court may conceive the legislators meant to express. It is not the function of construction to give a better act, but to ascertain and declare the sensible signification of the words used, when applied to the facts as they existed at the time of the passage of the statute. Since the increase by fifty per centum of the license tax to be paid for the operation of a prescribed track for racing within a designated part of the territorial area of Baltimore City is for revenue purposes, and does not bear equally and uniformly upon all persons in the same kind of business or enterprise, and this inequality and discrimination are clearly without a reasonable basis, the additional license or occupation tax is an arbitrary and unwarranted distinction, and, therefore, unconstitutional and void. *State v. Shapiro*, 131 Md. 168, 171, 101 A. 703; *In re Riley*, 39 Cal.App. 58, 177 P. 854; *State v. Osborne*, 171 Iowa 678, 164 N.W. 294; *State v. Mitchell*, 97 Me. 66,

53 A. 887; *Haddon Heights v. Hunt,* 90 N.J.L. 35, 101 A. 427, affirmed 91 N.J.L. 696, 103 A. 1052; *People v. Jenkins,* 202 N.Y. 53, 94 N.E. 1065; *People v. Wilber,* 198 N.Y. 1, 90 N.E. 1140; *Hartford Steam Boiler Inspection & Insurance Co. v. Harrison,* 301 U.S. 459, 461, 462, 57 S.Ct. 838, 81 L.Ed. 1223-1226. The class may be composed of one or more persons, so long as all who are or who may come into the like situation or circumstances are of the class. *In re Holman,* 197 Mo.App. 70, 191 S.W. 1109, affirmed 270 Mo. 696, 195 S.W. 711; *Durach's Appeal,* 62 Pa. 491; *Norfolk, P. & N. News Co. v. Norfolk,* 105 Va. 139, 52 S.E. 851.

By the equal protection clause of the Federal Constitution, discrimination between persons or property which are of the same class is forbidden, and equality and uniformity of persons of the same class are required in the imposition of occupation and license taxes. While perfect uniformity and perfect equality of taxation are not attainable, discrimination between individuals of the class taxed, by the selection of some for an exceptional burden, is plainly within the prohibition, and this is true whether the tax be an ordinary occupation tax as distinguished from a property tax, since the tax must nevertheless be the same upon all persons in the same class. *Cooley on Taxation,* secs. 259, 269.

The constitutional requirement of equality and uniformity may be violated by territorial inequality, as in the case of the imposition of a tax in one taxing district for the exclusive benefit of another. In addition to the question of equal protection of the laws, and of equality and uniformity of taxation, there are here also involved questions which concern the fundamental concept of equality of taxation in practical application to a particular territorial apportionment of taxes. The questions are so related that they may be considered in connection with one another. *Cooley on Taxation* (4th Ed.), sec. 310, p. 645.

In the chapter devoted to the title "Equality and Uniformity of Taxation" Cooley states: "In order to give

validity to any demand made by the state upon its people under the name of a tax, it is essential not only that the purpose to be accomplished thereby shall be public in its nature, but it is equally essential that the purpose shall be one which in an especial and peculiar manner pertains to the district within which it is proposed that the contribution called for shall be collected, and which concerns the people of that district more particularly than it does others. * * * Taxes are collected as proportionate contributions to public purposes. But to make them such in any true sense, they must not only be such as between the persons called on to pay them, but also as between those who 'ought' to pay them. * * * And it is no more incompetent to select classes of persons for exceptional burdens than it is to select districts of the state for that purpose. * * * A state purpose must be accomplished by state taxation, a county purpose by county taxation and a public purpose for any inferior district by taxation of such district. This is not only just but it is essential. To any extent that one man is compelled to pay in order to relieve others of a public burden properly resting upon them, his property is taken for private purposes, as plainly and as palpably as it would be if appropriated to the payment of the debts or the discharge of obligations which the person thus relieved by his payments might owe to private parties." *Cooley on Taxation* (4th Ed.), sec. 314, pp. 650-653, sec. 315, sec. 95; *Union Refrigerator Transit Co. v. Kentucky,* 199 U.S. 194, 202, 26 S.Ct. 36, 50 L.Ed. 150.

This principle was recognized and enforced in *Miller v. Wicomico County Commrs.,* 107 Md. 438, 69 A. 118. Again, in *Talbot County Commrs. v. Queen Anne's County Commrs.,* 50 Md. 245, the court, through Chief Judge Alvey, unanimously approved the principle in these words: "Indeed, it would be a startling proposition to announce, that it is competent to the Legislature to require the people of one county to raise money by taxation and apply it to the making of roads, bridges, or any other public improvement, in another county without

reference to any special benefit to be derived therefrom by the people thus taxed. Such legislation could not for a moment be sustained; and it is fully conceded by the counsel for the appellees that such legislation would be unconstitutional and void."

In the case last cited the principle thus stated did not have application because the levy of a tax in one county by way of contribution to the maintenance and construction of a draw-bridge in an adjoining county was supported solely for the reason that the object to be accomplished by the construction and maintenance of the draw-bridge was local in its character, and of special and peculiar interest to the people sought to be taxed. The facts which took the case cited out of the principle stated are not found on the record at bar.

If the area of Baltimore County now incorporated with Baltimore City be accepted as having been erected into a separate district for the purpose of imposing the additional tax of $3000 upon any race track located within the district, it does not appear that the taxing district so arbitrarily erected derives any special and peculiar advantage in the use by Baltimore County of the tax of $3000 in the manner prescribed. No direct benefit to this assumed taxing district within Baltimore City is to be found in the appropriation of two-thirds of the tax to be used and expended in the construction or maintenance of the public roads located in Baltimore County, according to the discretion of its County Commissioners, and of the one-third to be divided equally between two agricultural associations of Baltimore County. The purely local nature of these uses is accentuated by the provision that the funds available for roads and bridges shall be used, first, to the reconstruction of the Hanover turnpike between Reisterstown and the Carroll County line, and, second, to the construction and improvement of the Dulaney's Valley turnpike road northward from Towson, as both Reisterstown and Towson are to the north, and some miles distant from the nearest boundary of Baltimore City.

The majority view declares, apparently, that the tax would be invalid if the statute had imposed the tax and provided that the $3000 should be paid directly to Baltimore County, but that it becomes valid because the statute, after imposing the tax, appropriates $3000 to be used for the benefit of county public roads, bridges and local private corporate agricultural societies. It is not perceived how the appropriation of the tax to any of the local public purposes of Baltimore County would be unconstitutional, but that the appropriation of the same tax to some local public purpose of that county endows the act with constitutionality. In either case the tax imposed in one taxing district would be used for the local public purposes of another taxing district or county.

The decision in *State v. Applegarth,* 81 Md. 293, 31 A. 961, is not in point. It was there held that if the license tax imposed be valid, it was immaterial whether the proceeds of the tax were paid and placed mediately or immediately to the credit of the "Oyster Fund," which was dedicated by the statute to the purpose of maintaining sufficient and proper police regulations for the protection of fish and oysters in Maryland waters. In that case the license fee was exacted by the State for the packing of oysters and, when received, was applied by the State for the benefit and use of the State in the performance of a function peculiarly within the province of the State in relation to the protection of the oysters in the public waters of the State. It is submitted that the problem here is the primary one of the power to impose the license tax, and that the decision in *State v. Applegarth, supra,* is not authority nor precedent for the rule adopted and enforced by the decision in the present case, which, in over-ruling *Talbot County Commrs. v. Queen Anne's County Commrs., supra,* holds that it is neither a violation of the fundamental principle of equality which underlies all the rules relating to taxation, nor of the constitutional mandate that occupation and license taxes must be equal and uniform on persons of the same class, for the State to tax one taxing district for the sole bene-

fit of another taxing district, when the burdened taxing unit derives no direct or special benefit therefrom. The doctrine adopted is novel, unfair, and onerous. Its evil effect concerns the taxpayer in imposing upon him the necessity of contributing toward a purpose which, although it be public, is one in which he has no interest. It would compel him, and others of his class, to make periodical payments of certain sums for the exclusive benefit of the taxpayers of another municipality or part of the state. *Cooley on Taxation* (4th Ed.), sec. 95, pp. 223-225, sec. 1683, p. 3390, sec. 1817, p. 3571; *Cooley's Constitutional Limitations* (8th Ed.), p. 1039; *Willoughby on the Constitution*, vol. 3, sec. 1280. See *Alabama Power Co. v. City of Corbin Hill*, 234 Ala. 489, 175 So. 289, 291; *People v. Townsend*, 56 Cal. 633, 637; *White v. Decatur*, 225 Ala. 646, 144 So. 873; *Farris v. Vannier*, 6 Dak. 186, 42 N.W. 31; *Carlton v. Mathews*, 103 Fla. 301, 137 So. 815; *Amos v. Mathews*, 99 Fla. 1, 65, 115, 126 So. 308; *Scuffletown Fence Co. v. McAllister*, 12 Bush. (Ky.) 312; *State v. Lafayette Co.*, 134 La. 78, 82, 63 So. 630; *Dorgan v. Boston*, 12 Allen (Mass.) 223, 237; *In re Opinion of the Justices, In re State Taxation*, 97 Me. 595, 55 A. 827; *Manistee Lumber Co. v. Springfield Township*, 92 Mich. 277, 52 N.W. 468; *Sanborn v. Rice County*, 9 Minn. 273; *Wells v. Weston*, 22 Mo. 384; *City of St. Charles v. Nolle*, 51 Mo. 122, 124; *City of St. Clair v. George*, 225 Mo.App. 30, 33 S.W.2nd 1019, 1021; *Johnston County v. Lacy*, 174 N.C. 141, 93 S.E. 482; *Reeves v. Bumcombe County*, 204 N. C. 45, 167 S.E. 452; *Berlin Mills Co. v. Wentworth's Location*, 60 N.H. 156; *Keene v. Roxbury*, 81 N.H. 332, 126 A. 7; *Elizabethtown Water Co. v. Wade*, 59 N.J.Law 78, 34 A. 4; *In re Assessment of Lands in Flatbush*, 60 N.Y. 398, 406; *Hubbard v. Fitzsimmons*, 57 Ohio St. 436, 49 N.E. 477; *Simon v. Northup*, 27 Or. 487, 40 P. 560; *Hammett v. Philadelphia*, 65 Pa. 146, 150; *Sharpless v. Philadelphia*, 21 Pa. 147, 168; *Gulf Refining Co. v. Knoxville*, 136 Tenn. 253, 256, 188 S.W. 798; *Taylor v. Chandler*, 9 Heisk. (Tenn.) 349; *Robinson v. City of Norfolk*, 108 Va. 14, 60 S.E. 762; *Berry v. Fox*, 114 W.Va.

513, 172 S.E. 896; *Newman v. Schlarb,* 184 Wash. 147, 50 P.2nd 36; *Chicago & N. W. R. R. Co. v. Wisconsin,* 128 Wis. 553, 561, 108 N.W. 557; *Joslin v. Providence,* 262 U.S. 668, 673, 43 S.Ct. 684, 67 L. Ed. 1167.

The rule established by the court makes it lawful for the General Assembly to increase the license fee within the same section of Baltimore City, and to require the plaintiff to pay the new license fee to the County Commissioners of Garrett, Wicomico, St. Mary's or any other county for any specific local county purposes. As suggested in the able and exhaustive opinion of the chancellor, the traders and theatres doing business in Baltimore City might be required to pay additional license fees in aid of Carroll County to rebuild its jail. The field of taxation thus newly created would find its sole limit in the will of the General Assembly.