BLUMENTHAL ET UX. *v.* CLERK OF THE CIRCUIT
COURT FOR ANNE ARUNDEL COUNTY ET AL.

[No. 15, September Term, 1976.]

*Decided October 22, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*John J. Ghingher, Jr.,* and *Ronald J. Kwoka,* with whom was *Jerome T. May* on the brief, for appellants.

*Gerald I. Langbaum, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief; *Frederick C. Sussman, Assistant County Solicitor for Anne Arundel County,* with whom was *Michael Roblyer, County Solicitor,* on the brief; *H. Christopher Malone, Assistant County Attorney for Montgomery County,* with whom were

*Richard S. McKernon, County Attorney,* and *Robert G. Tobin, Jr., Deputy County Attorney,* on the brief; *Peter Max Zimmerman, Assistant County Solicitor for Baltimore County,* with whom were *J. Carroll Holzer, County Solicitor,* and *Harry S. Shapiro, Chief Assistant County Solicitor,* on the brief; and submitted on brief by *E. Thomas Merryweather, County Solicitor for Dorchester County, Joseph Ernest Bell, II, County Attorney for St. Mary's County, Thomas C. Hayden, Jr., County Attorney for Charles County, Benjamin L. Brown, City Solicitor, Ambrose T. Hartman, Deputy City Solicitor,* and *Richard K. Jacobsen, Chief Solicitor,* for Mayor and City Council of Baltimore, appellees.

LEVINE, J., delivered the opinion of the Court.

The primary question presented by this appeal is whether the General Assembly has granted statutory authority to certain counties and the City of Baltimore to fix by local resolution or ordinance the rate of tax to be charged in their respective jurisdictions for the recordation of instruments conveying title and securing debts. In the mandamus and declaratory judgment action from which this appeal arises, the Circuit Court for Anne Arundel County (Evans, J.) held that such authority had been granted. We issued a writ of certiorari prior to consideration of the case by the Court of Special Appeals and, for reasons that follow, we affirm.

At the heart of this case is the effect of Chapter 452, Laws of 1968 upon Maryland Code (1957, 1975 Repl. Vol.) Art. 81, § 277, dealing with the recordation tax, and the impact upon those statutory provisions of a recent decision of this Court.[1]

---

1. The following subsections of Code (1957, 1975 Repl. Vol.) Art. 81, § 277, as they provided following the 1968 session of the General Assembly, are relevant to this case:

"(b) *Instruments conveying title or securing debts.* — In the case of instruments conveying title to property, the tax shall be at the rate of 55¢ for each $500.00 or fractional part thereof of the actual consideration paid or to be paid; in the case of instruments securing a debt, the tax shall be at the rate of 55¢ for each $500.00 of the principal amount of the debt secured.

\* \* \* \*

"(m) *Allegany, Anne Arundel, Baltimore, Dorchester, Garrett, Montgomery, St. Mary's and Wicomico counties.* — The rate of tax

Chapter 452, in relevant part, added to § 277 a new subsection q which provided:

"Every county and Baltimore City may, by resolution or ordinance duly enacted by its governing body, fix the rate of tax imposed by this subtitle. In the absence of such resolution or ordinance, the rates specified in this subtitle shall continue to apply."

Prior to 1957, § 277 (b), which provided that the recordation tax rate generally "shall be at the rate of 55¢ for each $500.00 or fractional part thereof," applied to the 23 counties and the City of Baltimore. Subsection m was initially enacted by Chapter 778 of the Laws of 1957 so as to provide that the rate in Montgomery County "shall be at the rate of $1.10 for each $500 or fractional part thereof." By the close of the 1968 legislative session, seven other counties had been added to (m) by a series of amendments. Subsection n, added in 1961, applied to the City of Baltimore and three counties at the conclusion of the 1968 session. The City of Baltimore and six of the eleven counties named in (m) and (n) are among the appellees here.

Pursuant to the enactment of Chapter 452 in 1968, each of

applicable to instruments recorded with the clerk of the circuit court for Baltimore, Montgomery, St. Mary's, Wicomico, Allegany, Garrett, Dorchester, and Anne Arundel counties shall be as follows:

"In the case of instruments conveying title to property, the tax shall be at the rate of $1.10 for each $500 or fractional part thereof of the actual consideration paid or to be paid; in the case of instruments securing a debt, the tax shall be at the rate of $1.10 for each $500 of the principal amount of the debt secured.

"(n) *Baltimore City and Calvert, Charles and Worcester counties.* -- The rate of tax applicable to instruments recorded with the clerk of the Superior Court of Baltimore City and with the clerk of the circuit court for Charles, Calvert and Worcester counties shall be as follows:

"In the case of instruments conveying title to property, the tax shall be at the rate of $1.65 for each $500 or fractional part thereof of the actual consideration paid or to be paid; in the case of instruments securing a debt, the tax shall be at the rate of $1.65 for each $500 of the principal amount of the debt secured."

\* \* \*

the political subdivisions appearing here as an appellee, the City of Baltimore and the counties of Anne Arundel, Baltimore, Charles, Dorchester, Montgomery and St. Mary's, enacted local measures establishing the rate of the recordation tax in their respective jurisdictions. The rates thus established ranged from $1.65 to $3.50, thereby exceeding in each instance the amounts fixed by either (m) or (n) of § 277 for those six counties and the City of Baltimore.

A challenge to the recording tax rate set by Anne Arundel County precipitated the litigation which culminates in this appeal. When the Clerk of the Circuit Court for Anne Arundel County refused to accept a deed offered for recordation by appellants, who were the grantors therein, because they had tendered a recording tax computed at the $1.10 rate specified in § 277 (m) rather than the $3.50 rate enacted by the county council, appellants filed a suit in the circuit court which was ultimately amended to include as defendants the Comptroller, the City of Baltimore and the Clerk of the Superior Court of Baltimore City, as well as Baltimore, Charles, Dorchester, Montgomery and St. Mary's Counties and the clerks of their respective circuit courts. After the defendants moved for summary judgment, Judge Evans filed a thoroughly considered opinion and an order granting the motion, in which he ruled that § 277 (q) was applicable to the six counties and Baltimore City, and that the local enactments in each of those political subdivisions "setting the rate for the recordation tax in excess of that provided for in Article 81 Section 277 (m) and (n) are valid and have been valid since their enactment." The appeal followed.

(1)

Appellants advance several grounds for their contention that § 277 (q) does not authorize the political subdivisions enumerated in § 277 (m) and (n) to increase the recordation tax rate by local ordinance or resolution. We shall address these arguments, not all of which need be treated separately, in the course of dealing with the issues as we perceive them in this appeal.

Since all the subsections of § 277, constituting with § 278 the subtitle "Recordation Tax," represent a general statutory scheme or system, they must be read and considered together to ascertain the true intention of the Legislature. *Thomas v. State*, 277 Md. 314, 317, 353 A. 2d 256 (1976); *County Council v. Supervisor*, 274 Md. 116, 120, 332 A. 2d 897 (1975); *Parker v. Junior Press Printing*, 266 Md. 721, 725, 296 A. 2d 377 (1972). It is this rule, which we are bound to apply, that contributes to the dilemma in this case.

Confronted by the apparent contradiction between subsections m and n, on the one hand, each of which purports to mandate fixed rates for the political subdivisions enumerated therein, and (q), on the other, permitting "[e]very county and Baltimore City" to fix the tax rate, the circuit court concluded, correctly in our view, that an ambiguity existed requiring for its resolution a resort to the available legislative history of Chapter 452. Appellants do not attack this conclusion, but challenge instead both the rules of statutory construction and the particular legislative history relied upon in the court below. That resort may be had to the legislative history of a statute when an ambiguity exists is a cardinal rule of construction. *Mackie v. Town of Elkton*, 265 Md. 410, 415, 290 A. 2d 500 (1972); *Pressman v. Barnes*, 209 Md. 544, 558-59, 121 A. 2d 816 (1956); *see Crim. Inj. Comp. Bd. v. Gould*, 273 Md. 486, 495, 331 A. 2d 55 (1975).

As the record in this case reveals, House Joint Resolution 24 of the 1967 session of the General Assembly provided for creation of a commission to conduct studies and prepare corrective legislation for various state and local taxation and fiscal problems. This action led to formation of the Joint Legislative-Executive Committee to Study Taxation and Fiscal Problems which submitted its report to the General Assembly on January 1, 1968.[2] Noting that the federal recordation tax, which theretofore had been imposed at the rate of 55¢ per $500, was to be discontinued as of January 1, 1968, as part of an overall federal program of excise tax

---

2. The report of the Joint Legislative-Executive Committee was entitled "Next Steps in Tax Reform in Maryland."

reduction, the joint committee recommended "that the counties and Baltimore City be authorized to impose a recordation tax, upon 'instruments of writing' presently taxed in Maryland, *at such rate as each shall elect.*" (emphasis added). A footnote to one of the exhibits attached to the report, summarizing the fiscal effects of the various recommendations, stated:

> "Although local governments would be authorized to elect *any* level of increase, this estimate *assumes* a 55¢ for $500 increase for all — the level of the Federal tax being removed." (emphasis added).

House Bill 410 of the 1968 session, implementing the committee recommendations, was introduced by the house members of the joint committee, and Senate Bill 209, ultimately enacted as Chapter 452, was introduced by the senate members of the joint committee. A comparison of the various recommendations of the joint committee with Chapter 452, which dealt with a number of tax matters in addition to the recordation tax, erases any doubt that the enactment is the very embodiment of those recommendations.

While conceding that the report and recommendations accurately reflect the intention of the joint committee that every county and Baltimore City be authorized to impose a recordation tax at such rate as each should elect, appellants maintain that this was nevertheless not the intention of the General Assembly itself. Unquestionably, the report of the joint committee may be considered in ascertaining the legislative intent:

> "The history of the legislation, *committee reports*, other statutes in pari materia, and all related provisions of the same act must be considered in the construction of revenue laws." 3 Sutherland, Statutory Construction, § 66.03 (4th ed. Sands 1974) (emphasis added, footnotes omitted).

In short, as we have said, "the courts are not shut off from

any discussion or sources of information available to the Legislature in order to ascertain the legislative intent." *Public Service Comm. v. Sun Cab Co.*, 160 Md. 476, 481, [*West v. Sun Cab Co.*] 154 A. 100 (1931). *Accord, Allers v. Tittsworth*, 269 Md. 677, 683, 309 A. 2d 476 (1973) (revision commission reports considered by court).

Appellants urge, however, that there is a more accurate means of ascertaining the intention of the General Assembly. They point to the plethora of bills introduced and enacted at the 1968 session — no less than eight in number — effecting changes in § 277.[3] They argue that the unanimity displayed in regard to the eight bills by the committee in each house to which they were referred, and by the General Assembly itself, reflects an intention that (q) should not be operative with respect to the political subdivisions enumerated in (m) and (n). They reason that had the Legislature intended by its enactment of (q) to permit literally "every" county in the state and Baltimore City to fix its own rate, the six bills simultaneously amending (m), (n), (o) and (p), which set specific rates for many of the state's political subdivisions, would have been unnecessary, that is, mere surplusage.

The argument advanced by appellants overlooks the very nature of subsection q. It is, in effect, enabling legislation, which merely permits the governing body of "[e]very county and Baltimore City" to fix the recordation tax rate. Neither the committees of each house nor the General Assembly itself, while considering the eight bills, could have prophesied what might subsequently occur in some, let alone all, of those political subdivisions. The Legislature clearly recognized that the governing bodies of the political subdivisions enumerated in (m) and (n) might delay local implementation of (q) or, indeed, might not opt at all for different rates under authority of the enabling legislation reflected in (q). The purpose of the amendments to (m) and (n), therefore, was to ensure that absent a local resolution or ordinance fixing the tax rates in any of the political

---

3. Apart from the enactment of subsections q and r, six amendments were made to (m), (n), (o) and (p).

subdivisions covered by (m) and (n), provision would have been made by the General Assembly for specific rates to be charged in those subdivisions. That the Legislature was cognizant of these various possibilities while enacting Chapter 452 is evident from the second sentence of (q):

". . . In the absence of such resolution or ordinance, the rates specified in this subtitle shall continue to apply."

An additional reason for the precaution taken by the General Assembly could have been its recognition that Chapter 452 might ultimately fail of passage at the 1968 session.

In sum, then, the General Assembly clearly intended that subsection q should apply to Baltimore City and to the counties enumerated in (m) and (n).[4]

Stripped of its rhetoric, the thrust of appellants' argument is that our recent decision in *Prince George's Co. v. White,* 275 Md. 314, 340 A. 2d 236 (1975), fully supports their contention that (q) does not apply to Baltimore City and the counties enumerated in (m) and (n). That case is distinguishable. There, we were confronted by the interaction between (q) and subsection r, which was enacted by Chapter 301 of the Laws of 1968. Chapter 301, the title of which states that (r) is "to follow immediately after Section 277 (q)," provides:

*"Notwithstanding the other provisions of this section* the County Commissioners of Prince

---

[4]. As further evidence of the legislative intention that (q) should apply to the political subdivisions enumerated in (m) and (n), appellees point to the enactment of Chapter 129, Laws of 1976, which they also say, by motion to dismiss, renders this appeal moot. Chapter 129 and Chapter 142, a companion measure, were enacted as emergency legislation in obvious response to our recent decision in Prince George's Co. v. White, 275 Md. 314, 340 A. 2d 236 (1975). In a word, they appear designed to establish once and for all that (q) applies literally to the City of Baltimore and the 23 counties and to ratify and confirm *retroactively* the recordation rate fixed by any local resolution or ordinance of Baltimore City or the 23 counties becoming effective on or after July 1, 1968, notwithstanding a different rate specified for such political subdivision in any subsection of § 277. Because we have found, for the reasons given above, what the legislative intention was respecting Chapter 452, we need not rely on Chapters 129 and 142 for that purpose.

George's County in lieu of the rate of tax provided in subsection (b) above, are authorized by resolution to adopt a rate of tax as follows: In the case of instruments conveying title to property, the tax shall be at the rate of $1.10 for each $500.00 or fractional part thereof of the actual consideration paid or to be paid; and in the case of instruments securing a debt, the tax shall be at the rate of $1.10 for each $500.00 of the principal amount of the debt secured. . . ." (emphasis added).

Subsequent to the enactment of Chapters 301 and 452 at the 1968 session, the County Commissioners for Prince George's County adopted a resolution pursuant to (r) setting the tax rate at $1.10, but then, acting under the authority of (q), replaced it with a second resolution fixing the rate at $1.65. In the face of conflicting claims regarding the interplay between (q) and (r), we said in *White* that those subsections could be harmonized so as to render (r) neither superfluous nor repealed by implication. We found additional support for this result in the Legislature's express anticipation of Chapter 452 in Chapter 301, evidenced not only by the provision that (r) should obviously follow (q), but also by the opening words of (r), "Notwithstanding the other provisions of this section . . . ." We held, accordingly, that (r), not (q), was controlling in Prince George's County.

In our decision in *Prince George's Co. v. White, supra,* however, we included the following dicta:

". . . As we see it, the basic rates are set at $0.55 in subsection (b). By subsections (m), (n), (o), (p), and (r), the rates in the City of Baltimore and in 16 of the 23 counties, including Prince George's, are fixed in some other specific amount. Subsection (q), which merely allows '[e]very county and Baltimore City' to fix the rate by resolution or ordinance, is presently not operative in any of those counties and the City of Baltimore." *Id.* at 318.

Appellants seize upon the last sentence to support their

position in this case. Unfortunately for them, we do not agree.

It should be clear from a glance that (q) does not bear to (m) and (n) the same relationship which it does to (r). Neither (m) nor (n), though repealed and re-enacted at the very same 1968 legislative session, includes the words found in (r), "Notwithstanding the other provisions of this section," or otherwise refers to any other subsection of § 277. As we have demonstrated, (q) and (r) can be reconciled with each other while (q) vis-à-vis (m) and (n) produces an ambiguity. The statement in *White* upon which appellants rely here, however incorrect it may have been, was a mere dictum, not being necessary to a determination of the question there presented, *Kardy v. Shook*, 237 Md. 524, 544, 207 A. 2d 83 (1965), and is not controlling authority for their position.[5]

What we have said disposes in large measure of appellants' further contention that subsections m and n, each containing the word "shall," are mandatory in character. Although it is true that the word "shall" ordinarily imports a mandatory result, *Bright v. Unsat. C. & J. Fund Bd.*, 275 Md. 165, 169-70, 338 A. 2d 248 (1975); *Maryland St. Bar Ass'n v. Frank*, 272 Md. 528, 533, 325 A. 2d 718 (1974); *Ginnavan v. Silverstone*, 246 Md. 500, 505, 229 A. 2d 124 (1967), this rule is not absolute. Whether a statute is to be treated as mandatory or directory must be ascertained from the provisions of the statute itself, and the word "shall" is not treated as signifying a mandatory intent if the context in which it is used indicates otherwise, *Bright v. Unsat. C. & J. Fund Bd.*, *Maryland St. Bar Ass'n v. Frank*,

---

5. It might be well to note that unlike here, the record in *White* included neither the committee recommendations nor the report to which we have referred, undoubtedly because it was recognized that (q) vis-à-vis (r) did not present an ambiguity. The position of Prince George's County in *White*, as we there indicated, was simply that (r) was intended to apply only if (q) never became law. As noted above, we rejected this argument because we determined that there had been no implied repeal of (r). Although Prince George's County, in *White*, referred to the committee report for the first time in its motion for reargument, inclusion of the report in the record itself would not have produced a different result in that case because, as we have said here, it was inappropriate to resort there to the legislative history of Chapter 452.

*Ginnavan v. Silverstone,* all *supra.* Whatever may be the mandatory tenor of (m) and (n) standing alone, they must be read, as we said earlier, together with (q). The result is that (q), by its own terms, qualifies the mandatory effect of those prior subsections. We recognized in *White,* moreover, that subsection b, which also contains the word "shall," initially prescribed the basic recordation tax rate for the entire state. Since 1957, the General Assembly has established by the addition of further subsections, including (m) and (n), a different rate for Baltimore City and some but not all of the 23 counties. At no time since 1957 does it appear to have been suggested that (b) was of mandatory effect because of the word "shall." Were we to treat the word "shall" as having a mandatory import in (m) and (n), while not doing so in regard to (b), we would be according contrary meanings to the identical word within the very same statute, a consequence which, in the absence of legislative expression, we should strive to avoid. The word "shall," therefore, no more produces in (m) and (n) a mandatory effect than it does in (b).

We hold that Chapter 452, enacting subsection q of § 277, authorizes the governing bodies of Baltimore City and the counties enumerated in subsections m and n to fix by local ordinance or resolution the rate of recordation tax to be paid within their respective jurisdictions.

(2)

Appellants also urge that even if § 277 (q) permits Baltimore City and the counties to fix the recordation tax rate, the ordinances enacted by Baltimore City and by Baltimore and Charles Counties, though adopted after Chapter 452 was signed and though not themselves to become effective until July 1, are void because they were promulgated prior to the effective date of subsection q, July 1, 1968. Appellants argue that when political subdivisions implement legislation prior to its effective date, they act beyond their authority. They rely primarily upon an opinion of the Attorney General, 46 *Opinions of the Attorney General* 199 (1961), to support their contention. There, he

took the position that the action of the Queen Anne's County Commissioners on May 29, 1961, purporting to put into effect an increase in the recordation tax rate, was unlawful because the act of the General Assembly authorizing them to do so did not become effective until June 1, 1961. The Attorney General there narrowly construed the rights and powers of the counties. We have said, on the other hand, that a county may exercise "the authority with which [it has] been expressly, or as a reasonable implication, invested by law." *Montgomery Co. v. Met. District*, 202 Md. 293, 304, 96 A. 2d 353 (1953). We think that by reasonable implication Chapter 452 conferred upon the political subdivisions the power to adopt, prior to the effective date of the statute, implementing legislation which itself was not to become operative until that very same effective date.

Appellants contend, however, that to prevent ultra vires action by a county, ordinances are required to conform precisely to the enabling legislation upon which they are based. For this proposition, they cite *Scrivner v. Baltimore*, 191 Md. 165, 169, 60 A. 2d 190 (1948), *Consolidated Diesel Elec. Corp. v. City of Stamford*, 156 Conn. 33, 238 A. 2d 410, 411-12 (1968), *Mastrangelo v. Buckley*, 433 Pa. 352, 250 A. 2d 447, 452-53 (1969), and *Taylor v. Abernathy*, 422 Pa. 629, 222 A. 2d 863, 865 (1966). Those cases, however, involved discrepancies between the substantive aspects of the enabling and implementing legislation and are thus readily distinguishable.

One of the recognized purposes in providing that a statute become effective on some future date, rather than upon the signing of the bill, is "to allow the government time to establish machinery" for enforcement of the act. 2 Sutherland, Statutory Construction § 33.07 (4th ed. Sands 1973). Here, the counties properly utilized the time before July 1 to establish appropriate tax rates. They did not, however, collect the recordation tax at the increased rates until July 1, which by law, Code (1957, 1973 Repl. Vol.) Art. 19, § 35, is the beginning of their fiscal year. Appellants maintain also that to enact an implementing ordinance prior to the effective date of the enabling legislation defeats

another objective, "to inform persons of the provisions of a statute . . . in order that they may take steps to protect their rights and discharge their obligations." 2 Sutherland, Statutory Construction § 33.07 (4th ed. Sands 1973). They claim that as a result of the action by the local units prior to July 1, the citizens of those subdivisions were unable to make their views on the ordinances known to their local governing bodies. We are not persuaded by this argument. Appellants conceivably had more notice of the ordinances prior to the effective date than they might have been afforded had the counties and the City of Baltimore waited until July 1 before acting. Nor did the local ordinances in any manner curtail appellants' right to petition Chapter 452 to referendum pursuant to Art. XVI, §§ 1 and 2 of the Maryland Constitution.

The Supreme Court, under circumstances perhaps more compelling than those present here, rejected in *Druggan v. Anderson*, 269 U. S. 36, 46 S. Ct. 14, 70 L. Ed. 151 (1925), a contention that parallels appellants' position in this case. Contesting a refusal to issue a writ of habeas corpus, Druggan argued that the National Prohibition Act was void because it was enacted before the prohibition was placed in effect, although after the Eighteenth Amendment had been ratified. The Court, speaking through Mr. Justice Holmes, perceived the ratification as a present grant of power and held that the Constitution may give Congress "a present power to enact laws intended to carry out constitutional provisions for the future when the time comes for them to take effect." 269 U. S. at 39. *See also* Annot., 171 A.L.R. 1070, 1075-78 (1947). We hold that the enactment of Chapter 452 on May 7, 1968, the date on which it was signed by the governor, granted to the local authorities a present power to enact ordinances in preparation for increasing the tax rate on July 1, 1968.

The result we reach here makes it unnecessary for us to pass on appellees' motion to dismiss the appeal.

*Judgment affirmed; appellants to pay costs.*