897 A.2d 228

**CITY OF FREDERICK, Maryland**

v.

**Allan M. PICKETT.**

**No. 74, Sept. Term, 2005.**

Court of Appeals of Maryland.

April 19, 2006.

Reconsideration Denied May 31, 2006.

412

Justin P. Hayes, Frederick, for appellant.

Richard M. Winters (William L. Haugh, Jr. of Haugh & Winters, LLP, Frederick), on brief, for appellee.

Argued before BELL, C.J., WILNER, CATHELL, HARRELL, BATTAGLIA, GREENE and JOHN C. ELDRIDGE, (retired, specially assigned), JJ.

BATTAGLIA, J.

The case *sub judice* presents this Court with the task of determining whether the Circuit Court for Frederick County properly dismissed the City of Frederick's ("the City") condemnation action with respect to Allan M. Pickett's property. Because we hold that Maryland Code (1957, 2001 Repl.Vol.), Article 23A, Section 2(b)(37) permits a municipal authority to condemn individual blighted properties that are not within a "blighted area" or "slum area" for urban renewal purposes as a matter of law, we shall reverse the judgment of the Circuit Court and remand the case to that court for further proceedings.

### *Background*

In 1982, Allen Pickett purchased a two-story brick home located at 20 West Fourth Street, Frederick, Maryland ("the Property"), lived there for approximately one week and thereafter leased it until 1993 to a tenant, after which it remained unoccupied. In 1996, the Frederick City Police Department reported to the Office of Code Enforcement for the City of Frederick that the Property was littered with broken glass and that the rear entrance to the building was broken open. The Office of Code Enforcement verified the complaint and, upon visiting the premises, determined that vagrants were using the Property and removing the building's contents. Michael Blank, a building inspector with the Office of Code Enforcement, observed that fires were being set within the

building and that the floor was covered in trash and fecal matter. Moreover, he noted that the foundation in the rear of the building was sinking, which compromised its structural integrity. On May 8, 1996, the Property was condemned. The City sent notice to Pickett instructing him to secure the Property and clean it up within five days. On May 16, 1996, Blank again visited the Property and confirmed that the building was secured but that the trash on the premises remained. The City removed the garbage and billed the costs to Pickett.

Two years later, the Office of Code Enforcement once again received a complaint from the police stating that the basement door of the Property was broken open and that the Property was covered in litter. An inspection confirmed the allegations of the complaint, and the Office of Code Enforcement again sent a letter to Pickett instructing him to clean up the Property within five days. When a subsequent inspection revealed that the Property remained in non-compliance, the City cleaned the Property and sent a bill to Pickett for the costs as well as a penalty of three hundred dollars.

After receiving repeated complaints from the police regarding the Property in 1998 and 1999, the Office of Code Enforcement conducted a comprehensive inspection of the premises on September 14, 1999, and sent a Notice of Violation to Pickett informing him that he had a month to make necessary repairs to the Property consisting of removing the garbage from the lot and repairing the rear door to bring it into compliance with the Property Maintenance Code. In October, the Office of Code Enforcement inspected the Property again; it remained in a state of non-compliance. On January 20, 2000, Pickett was sent seventy-seven citations for the period from October 16, 1999 through December 31, 1999. The citations were sent to Post Office Box 378, Mount Airy, Maryland, which was an address that the City had for Pickett. On February 9, 2000, the citations were returned to the Office of Code Enforcement as undeliverable. The Office of Code Enforcement subsequently posted the citations on the Property.

A subsequent inspection on January 2, 2002, revealed that the corner of the building on the Property continued to sink into the ground and that the Property continued to be used by transients for the consumption of alcohol and crack cocaine. One week later the City took action to reinforce the sinking foundation and declared the building "an unsafe structure" under the Property Maintenance Code.[1]

On March 21, 2002, the City's Board of Aldermen [2] passed Ordinance G–02–3, the purpose of which was to "authorize the City to acquire blighted properties by eminent domain and to subsequently dispose of said properties, and thereby to promote public health, safety, and welfare, and to facilitate the use and enjoyment of property." Ordinance G–02–3 provided in pertinent part:

(1) Pursuant to the express authority described above, the City may:

(a) Subject to the provisions of paragraph (4) of this section, acquire, within its boundary lines, land and property of every kind, and any right, interest, franchise, easement or privilege therein, by purchase, lease, gift, condemnation or any other legal means, for development or redevelopment, including, but not limited to, the comprehensive renovation or rehabilitation thereof; and

(b) Sell, lease, convey, transfer or otherwise dispose of any of said property, regardless of whether or not it has been developed, redeveloped, altered or improved and irrespective of the manner or means in or by which it may have been acquired, to any private, public or quasi-public corporation, partnership, association, person or other legal entity.

---

1. *See generally* The Frederick City Code, Chapter 12.5, "Housing."

2. Article 2, Section 7 of the Frederick City Charter provides in pertinent part:

All legislative powers of the city shall be vested in a board of aldermen consisting of five (5) aldermen who shall be elected as hereinafter provided and who shall hold office for a term of four (4) years or until their successors are elected and qualified.

(2) No land or property taken by the City for any of the aforementioned purposes, or in connection with the exercise of any of the powers authorized hereunder, shall be taken without just compensation, as agreed upon between the parties or awarded by a jury, being first paid or tendered to the party entitled to such compensation.

(3) All land or property needed, or taken by the exercise of the power of eminent domain, by the City for any of the aforementioned purposes, or in connection with the exercise of any of the powers authorized hereunder, is hereby declared to be needed or taken for a public use or a public benefit.

(4) Before the acquisition of any single family or multiple family dwelling unit, or other structure, is made under this Chapter, a finding or determination shall be made that:

(a) The dwelling unit or structure has deteriorated to such an extent as to constitute a serious and growing menace to the public health, safety and welfare;

(b) The dwelling unit or structure is likely to continue to deteriorate unless corrected;

(c) The continued deterioration of the dwelling unit or structure will contribute to the blighting or deterioration of the area immediately surrounding the dwelling unit or structure; and

(d) The owner of the dwelling unit or structure has failed to correct the deterioration thereof.

(5) The City shall adopt an Ordinance for each acquisition of land or property made under the provisions of this Chapter. Each specific ordinance so adopted shall be maintained by the Legislative Clerk of the City in a file titled "Eminent Domain."

Immediately after passing Ordinance G–02–3, the Board of Alderman discussed Ordinance ED–02–1, which permitted the City to acquire the Property at 20 West Fourth Street through its eminent domain powers. During the meeting the following colloquy occurred:

MAYOR DOUGHERTY:.... We are looking at the ordinance to acquire real property, located at 20 West 4th Street, through the exercise of eminent domain.

ALDERMAN M. HALL: I move for acceptance.

ALDERMAN BALDI: You have to base it on five (5) points.

ALDERMAN M. HALL: Okay. Let's see. I move for acceptance of the ordinance to acquire real property located at 20 West 4th Street through the exercise of eminent domain, finding that the structure located at 20 West 4th Street has deteriorated to such an extent as to constitute a serious and growing menace to public health, safety, and welfare; that this structure is likely to continue to deteriorate unless corrected; that the continued deterioration of the structure will contribute to the blighting or deterioration of the area immediately surrounding the structure; and that the owner of the dwelling unit or structure has failed to correct the deterioration thereof.

ALDERMAN RAMSBURG: Second.

MAYOR DOUGHERTY: We have a motion from Alderman Marcia Hall, a second from Alderman Ramsburg. All in favor, signify by raising your right hand. That is five (5)— "O" (0). Ladies and gentlemen, congratulations. Good work, guys. Good job.

Pickett has conceded that on March 25, 2002, Frederick Mayor Dougherty signed the enabling ordinance, Ordinance G–02–3, immediately prior to signing Ordinance ED–02–1, which specifically authorized the taking of the Property.

On April 10, 2002, the City initiated condemnation proceedings in the Circuit Court for Frederick County. Five days later, the Circuit Court issued a summons for Pickett, which listed his address as 755 East Watersville Road, Frederick, Maryland 21701. The City, however, was unable to effectuate service prior to the expiration of that summons. On June 28, 2002, the City applied to have the Circuit Court reissue the summons for Pickett with the same address. The court did so. Once again, the City was unable to serve Pickett prior to

the expiration of the reissued summons. On September 25, 2002, the City again requested that the Circuit Court reissue a summons for service on Pickett at the same address, which the court did. The City attempted to effect service of process throughout the following year.

After repeatedly being unable to effect service upon Pickett, on July 7, 2003, the City filed a motion for alternate service, which the Circuit Court granted, thereby permitting the City to serve process upon Pickett through mailing him a copy of the summons, complaint and other relevant papers at his last known address, which was listed with the State Motor Vehicle Administration as 170 Baughman's Lane, Frederick, Maryland. The City also served Pickett through regular mail at two other addresses: P.O. Box 378, Mount Airy, Maryland; and 755 East Watersville Road, Frederick, Maryland.[3] Thereafter, on October 10, 2003, the City obtained a default judgment against Pickett based on his failure to respond to the complaint.

On November 10, 2003, Pickett filed a motion to strike service of process and to vacate the default judgment entered against him. On December 12, 2003, the Circuit Court vacated the default judgment entered against Pickett, but denied his motion to strike service of process. One month later, Pickett filed his answer, wherein he raised the affirmative defenses of *ultra vires*,[4] lack of *in personam* jurisdiction over him, collateral estoppel, estoppel, and illegality, and asserted

---

**3.** The P.O. box was an address previously on file with the City, and the address on East Watersville Road was the residence of Pickett's father.

**4.** We have defined *ultra vires* as "denot[ing] some act or transaction on the part of a corporation which, although not unlawful or contrary to public policy if done or executed by an individual, is yet beyond the legitimate powers of the corporation as they are defined by the statutes under which it is formed or which is applicable to it, by its charter or incorporation paper." *Pennsylvania R. Co. v. Minis*, 120 Md. 461, 488, 87 A. 1062, 1072 (1913). We have recognized the application of the doctrine of *ultra vires* to municipal corporations. *See Boitnott v. Mayor and City Council of Baltimore City*, 356 Md. 226, 738 A.2d 881 (1999); *Inlet Associates v. Assateague House Condominium Ass'n*, 313 Md. 413, 545 A.2d 1296 (1988).

the failure to state a claim upon which relief can be granted as a ground for dismissal.

On April 26, 2005, the Circuit Court held an evidentiary hearing addressing the City's entitlement to condemn the Property. At the hearing, Pickett made an oral motion to dismiss the City's condemnation action based on several grounds. He asserted that the City's action was *ultra vires* because Article 23A of the Maryland Code did not empower the City to condemn an individual property within a non-blighted area, and the Board of Aldermen acted beyond its authority when it passed the ordinance applicable to the Property prior to the mayor's approval of the enabling ordinance. He contended that the City could condemn only those properties located within a "blighted area," to which end he introduced testimony from a appraiser that his property was not located in a "blighted area" or "slum area." Pickett also presented portions of Michael Blank's deposition testimony regarding his knowledge of Pickett's actual address in support of his argument that the City was acting in bad faith when it claimed to be unable to provide him with notice of the citations issued concerning the Property and to effectuate service of process in the condemnation proceeding.[5] As his final argument, Pickett asserted that the City never obtained *in rem* jurisdiction over him because the City was not entitled to substituted service because of the bad faith that he alleged formed the basis for its previous attempts to effect service; Pickett contended that the City was aware of an accurate address at which service could have been made. After hearing argument from both sides, the Circuit Court explicated the reasoning for its decision on the record as follows:

I heard today attacks on these proceedings on a number of bases. I've made one ruling [6] and I've heard attacks on the

---

5. In Mr. Blank's deposition testimony, Mr. Blank conceded that he had received a motion for injunction from Pickett that listed his current address as Route 2, Box 31, Clearville, Pennsylvania prior to the City's initiation of condemnation proceedings involving Pickett's property.

6. Pickett also argued that the City was collaterally estopped from condemning the Property based on the Circuit Court's previous denial

basis that the ordinance upon which this condemnation proceeding is based is itself ultra vires in the way that it was enacted and in accordance with the charter. Or, the argument would actually be that it was not enacted in accordance with the charter, and therefore, the action taken was ultra vires.

I've heard testimony with regard to whether or not there is blight at this property; argument on the issue of constructive fraud as to the information given to the Court to obtain service of process and whether or not the City knew of or had within its grasp information as to he correct address of Mr. Pickett, and then, finally, I don't believe I'm excluding anything, arguments on constitutional defects of the proceedings in terms of vagueness of the language of the ordinance, the absence of public benefit, and probably a little more, but I'm clear. Okay.

\* \* \*

Fundamentally, the Maryland General Assembly provided in Article 23(a), Section 2(b), that municipalities have these express powers, and, frankly, we know that the municipality has certain express powers, its has certain implied powers, it has certain powers necessary to carry out that authority, but for purposes of today's proceeding, we're focused on the express power provided by the General Assembly in item 37 of subsection 2(b) of Article 23(a). . . . It says in addition to the authority provided elsewhere in this subsection, subsection 2(b), and provided the municipal corporation has urban renewal authority granted under Article 3, Section 61 of the Maryland Constitution, and there's provision in that article for acquisition of property by condemnation, and subject to the provisions of subparagraph (iv) to acquire within the boundary lines of the municipal corporation . . . land and

---

of the City's request for an injunction to allow for a demolition of a balcony on the building on the Property because the City believed that it constituted an imminent danger. The Circuit Court denied relief based on collateral estoppel because the issues were sufficiently different.

property of every kind by condemnation or development or redevelopment, including, but not limited to, the comprehensive renovation or rehabilitation thereof. Now, that subsection (iv) says that before the acquisition of a single family or multiple family dwelling unit or structure, other structure is made under this paragraph, certain findings have to be made, four findings.

\* \* \*

What's at issue in this case is a single property. . . . In other words, the City has exercised its discretion to an appropriate extent as to this single property, but I'm—I keep harking back to the definitions which talk about slum area, blighted area, and within each definition of area there are references to dwellings predominate, majority buildings. It nowhere says a slum property, a blighted property. In fact, to step back, it talks about carrying out urban renewal projects and it keeps then referring to slum clearance and slum or blighted areas and redevelopment or the rehabilitation of slum or blighted areas. It doesn't talk about even a renewal, a suburban renewal project which affects one property. I don't think I—I'm not going to say it again because I hope I've made my point. The authority granted in Article 3, Section 61, which is the enabling cornerstone, refers to blighted area and slum area, which in turn, refer to multiple buildings.

\* \* \*

I realize that the authority the Constitution grants and which the general assembly exercised and which the City has attempted to invoke is that authority to take private property through condemnation, eminent domain, when it's necessary for slum clearance, for the purpose of carrying out urban renewal projects, but limited to slum clearance in slum or blighted areas, which, in turn, are area—which are areas, first of all, I can stop there—but area specifically defined to include multiple dwellings, or, in the case of

blighted areas, multiple buildings or a place where a majority of buildings have declined in productivity.

\* \* \*

With all of that, I must dismiss these proceedings. Mr. Winters, I'm going to ask you to submit an order. I think you can merely say for the reasons stated, or words to that effect, from the bench, the Court's oral opinion, the matter will be dismissed. Thank you.

■ On May 26, 2005, the City filed its notice of appeal, and thereafter, this Court issued, on its own initiative, a writ of certiorari, *Frederick v. Pickett,* 389 Md. 398, 885 A.2d 823 (2005), prior to any proceedings in the intermediate appellate court. The City's brief presented the following issue:

Whether under Maryland Code (1957, 2001 Repl.Vol.), Article 23A, Section 2(b)(37), the Appellant's legislature was required to determine that the Subject Property was within a "slum area" or "blighted area" as those terms are defined in Maryland Constitution, Article 3, Section 61 to acquire the Subject Property for the public purpose of development or redevelopment.

In his responsive brief in this Court, Pickett also raised the following issues for our consideration: [7]

1. Was the trial court legally correct in dismissing Appellant's Amended Complaint because Appellant's simultaneous enactment of both the enabling ordinance and the ordinance specific to Appellee's property rendered both the specific

---

**7.** When we assume jurisdiction over an appeal pending, but undecided, before the Court of Special Appeals, we "consider those issues that would have been cognizable by the Court of Special Appeals." Md. Rule 8–131(b)(2). Thus, we rely on the question or questions in both the appellant's brief and the appellee's brief to present the issue or issues we consider. *See de la Puente v. County Commissioners of Frederick County,* 386 Md. 505, 508 n. 4, 873 A.2d 366, 368 n. 4 (2005); *Converge Servs. Group, LLC v. Curran,* 383 Md. 462, 467 n. 1, 860 A.2d 871, 874 n. 1 (2004). *See also Dual Inc., v. Lockheed Martin Corp.,* 383 Md. 151, 161 n. 3, 857 A.2d 1095, 1100 n. 3 (2004).

ordinance and Appellant's subsequent actions in seeking to condemn Appellee's property *ultra vires,* illegal acts?

2. Was the trial court legally correct in dismissing Appellant's Amended Complaint because the Circuit Court never acquired *in rem* jurisdiction over Appellee's property?

3. Was the trial court legally correct in dismissing Appellant's Amended Complaint because Appellant's action in determining the necessity for condemning Appellee's property was so oppressive, arbitrary, and unreasonable as to suggest bad faith?

We hold that the Circuit Court erroneously dismissed the City of Frederick's condemnation action based on an incorrect interpretation of the requirements of Maryland Code (1957, 2001 Repl.Vol.), Article 23A, Section 2(b)(37).

 Although the Circuit Court relied solely on its erroneous interpretation of Maryland Code (1957, 2001 Repl.Vol.), Article 23A, Section 2(b)(37) as the basis for its dismissal of the City's complaint for condemnation of the Property, we could affirm the dismissal "on any ground adequately shown by the record, whether or not relied upon by the trial court." *Berman v. Karvounis,* 308 Md. 259, 263, 518 A.2d 726, 728 (1987), citing *Robeson v. State,* 285 Md. 498, 502, 403 A.2d 1221, 1223 (1979) (and cases cited therein), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980). As we noted in *Robeson,*

> [c]onsiderations of judicial economy justify the policy of upholding a trial court decision which was correct although on a different ground than relied upon. This was explained by the Supreme Court in *Securities and Exchange Com. v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943): 'It would be wasteful to send a case back to the lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate.'

*Robeson,* 285 Md. at 502, 403 A.2d at 1223. Therefore we may consider whether the Circuit Court's dismissal could be af-

firmed on alternate grounds adequately shown in the record. Of the three alternate grounds presented by Pickett for our consideration, only the issue of whether the Board of Aldermen's approval of the ordinance applicable to the Property was an *ultra vires* action was adequately developed in the record. The Circuit Court's dismissal of the City's condemnation action, however, may not be upheld on the ground that the Board of Aldermen's actions were *ultra vires* because the Board was not required to enact an enabling ordinance prior to the passage of an ordinance authorizing the condemnation of a specific property. Moreover, assuming *arguendo* that an enabling ordinance was required, the Board of Aldermen was empowered to pass the second ordinance in anticipation of the enabling ordinance's approval by the mayor, particularly because the parties do not dispute the fact that the mayor signed the enabling ordinance prior to signing the ordinance specifically aimed at the condemnation of the property at issue in the present case. The remaining two issues, lack of *in rem* jurisdiction and bad faith, were not adequately developed in the record and as such, we may not rely upon them as grounds to uphold the Circuit Court's dismissal.

### *Discussion*

■ The City argues that the language of the controlling statute, Maryland Code (1957, 2001 Repl.Vol.), Article 23A, Section 2(b)(37),[8] is clear and unambiguous. According to the

---

**8.** Maryland Code (1957, 2001 Repl.Vol.), Article 23A, Section 2(b)(37) provides in pertinent part:

(b) *Express powers.*—In addition to, but not in substitution of, the powers which have been, or may hereafter be, granted to it, such legislative body also shall have the following express ordinance-making powers:

\* \* \*

(37)(i) In addition to the authority provided elsewhere in this subsection, and provided the municipal corporation has urban renewal authority granted under Article III, Section 61 of the Maryland Constitution:

1. Subject to the provisions of subparagraph (iv) of this paragraph, to acquire, within the boundary lines of the municipal corporation, land and property of every kind, and any right, interest, franchise,

City, the purpose of Article 23A, Section 2(b)(37) is to empower municipalities to condemn individual blighted properties even within a non-blighted area. Therefore, the City concludes that the Board of Aldermen properly exercised its power to do so when it passed an ordinance authorizing the condemnation of Pickett's property. Moreover, the City asserts that even if the language were ambiguous, the legislative history and the context surrounding the enactment of Article 23A, Section 2(b)(37) support the interpretation that the statute does not require the finding of a "slum area" or "blighted area" for the City to be able to condemn the Property.

Pickett concedes that Article 23A, Section 2(b)(37) empowers municipalities to condemn individual blighted properties within a non-blighted area; however, he asserts that the dismissal may be upheld on appeal regardless of the fact that the Circuit Court's interpretation of Article 23A, Section 2(b)(37) was erroneous. To that end, Pickett argues that the simultaneous enactment of both the enabling ordinance and the ordinance specific to the Property rendered the specific ordinance and all of the actions arising thereunder *ultra vires.* Specifically, Pickett contends that the City's Board of Aldermen lacked the legal authority to conduct a fact-finding hearing regarding his property and to pass the ordinance provid-

---

easement or privilege therein, by purchase, lease, gift, condemnation or another other legal means, for development or redevelopment, including, but not limited to, the comprehensive renovation or rehabilitation thereof; and

\* \* \*

(iv) Before the acquisition of any single family or multiple family dwelling unit, or other structure, is made under this paragraph, a finding or determination shall be made that:

1. The dwelling unit or structure has deteriorated to such extent as to constitute a serious and growing menace to the public health, safety, and welfare;

2. The dwelling unit or structure is likely to continue to deteriorate unless corrected;

3. The continued deterioration of the dwelling unit or structure will contribute to the blighting or deterioration of the area immediately surrounding the dwelling unit or structure; and

4. The owner of the dwelling unit or structure has failed to correct the deterioration thereof.

ing for the condemnation of his property on March 21, 2002, because the enabling ordinance was not effective.

The City rejoins that the condemnation action with respect to the Property was not *ultra vires* because the Board of Aldermen properly approved the ordinance and had the authority to conduct the necessary fact-finding hearing under Maryland law. According to the City, under the applicable statute, the Board of Aldermen was not required to approve an enabling ordinance prior to being able to exercise its power to conduct fact-finding proceedings or prior to passing the ordinance specifically directed at Pickett's property.

 Our resolution of whether the Circuit Court properly dismissed the Amended Complaint turns on our construction of the provisions of the Maryland Code. When construing a statute we first look to the normal, plain meaning of the language. *Davis v. Slater,* 383 Md. 599, 604, 861 A.2d 78, 81 (2004); *Fish Market Nominee Corp. v. G.A.A.,* 337 Md. 1, 8, 650 A.2d 705, 708 (1994); *Luppino v. Gray,* 336 Md. 194, 204 n. 8, 647 A.2d 429, 434 n. 8 (1994); *Rand v. Rand,* 280 Md. 508, 511, 374 A.2d 900, 902 (1977); *Balto. Gas & Elect. Co. v. Board,* 278 Md. 26, 31, 358 A.2d 241, 244 (1976); *Johnson v. State,* 360 Md. 250, 265, 757 A.2d 796, 804 (2000). If that language is clear and unambiguous, we need not look beyond the provision's terms to inform our analysis, *Davis,* 383 Md. at 604, 861 A.2d at 81; *Fish Market,* 337 Md. at 8, 650 A.2d at 708; *Rand,* 280 Md. at 511, 374 A.2d at 902; *Johnson,* 360 Md. at 265, 757 A.2d at 804; however, the goal of our examination is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision. *Davis,* 383 Md. at 604, 861 A.2d at 81; *Morris v. Prince George's County,* 319 Md. 597, 603–04, 573 A.2d 1346, 1349 (1990), citing *Dept. of the Environment v. Showell,* 316 Md. 259, 270, 558 A.2d 391, 396 (1989); *Harford County v. Edgewater,* 316 Md. 389, 397, 558 A.2d 1219, 1223 (1989).

In 1995, the General Assembly enacted Senate Bill 379, which added Subsection 2(b)(37) to Article 23A of the Maryland Code, and provided in pertinent part:

(37)(i) In addition to the authority provided elsewhere in this subsection, and provided the municipal corporation has urban renewal authority granted under Article III, Section 61 of the Maryland Constitution:

1. Subject to the provisions of subparagraph (iv) of this paragraph, to acquire within the boundary lines of the municipal corporation, land and property of every kind, and any right, interest, franchise, easement or privilege therein, by purchase, lease, gift, condemnation or any other legal means, for development or redevelopment, including, but not limited to, the comprehensive renovation or rehabilitation thereof;

\* \* \*

(iv) Before the acquisition of any single family or multiple family dwelling unit, or other structure, is made under this paragraph, a finding or determination shall be made that:

1. The dwelling unit or structure has deteriorated to such an extent as to constitute a serious and growing menace to the public health, safety, and welfare;

2. The dwelling unit or structure is likely to continue to deteriorate unless corrected;

3. The continued deterioration of the dwelling unit or structure will contribute to the blighting or deterioration of the area immediately surrounding the dwelling unit or structure; and

4. The owner of the dwelling unit or structure has failed to correct the deterioration thereof.

1995 Md. Laws, Chap. 519, codified as Md.Code (1957, 2001 Repl.Vol.), Art. 23A § 2(b)(37). The inclusion of the language "[b]efore the acquisition of any single family or multiple family dwelling unit, or other structure, is made under this paragraph" clearly evidences the General Assembly's intention to grant municipalities the power to condemn an individual blighted property. The statute does so without any condition that the specific property is within a "slum area" or "blighted area," or any requirement that the particular property or land

is condemned in conjunction with the condemnation of the surrounding parcels. Moreover, the provision does not encompass a municipality's ability to condemn "slum areas" or "blighted areas" as it presumes that the municipality has already been granted such authority pursuant to Article III, Section 61 of the Maryland Constitution.

This conclusion is bolstered further by the inclusion of a list of four factual determinations that must be made prior to condemning an individual blighted property. Although the statute requires the municipality to make certain findings regarding the deterioration of the property and give notice to the owner, it does not mandate that the municipality make any determinations concerning whether the immediate area surrounding the property in question is currently blighted. The focus is on the specific property at issue: whether it is currently blighted, will continue to be blighted, and will contribute to the blighting of the surrounding locality in the future. Rather than empowering the municipality to take remedial measures to fight blight as Article III, Section 61 does, Article 23A, Section 2(b)(37) enables the municipality to take preemptive actions to stop the spread of blight within an area by condemning properties that are, in and of themself, blighted.

The express language of Article 23A, Section 2(b)(37) requires that the municipality, prior to exercising the power granted by the statute, must have urban renewal authority under Article III, Section 61 of the Maryland Constitution.[9]

---

9. Maryland Constitution Article III, Section 61 provides in pertinent part:

(a) The General Assembly may authorize and empower any county or any municipal corporation, by public local law:

(1) To carry out urban renewal projects which shall be limited to slum clearance in slum or blighted areas and redevelopment or the rehabilitation of slum or blighted areas, and to include the acquisition, within the boundary lines of such county or municipal corporation, of land and property of every kind and every right, interest, franchise, easement or privilege therein, by purchase, lease, gift, condemnation or any other legal means. The term "slum area" shall mean any area where dwellings predominate which, by reason of

The General Assembly granted the City of Frederick urban renewal authority in 1961. 1961 Md. Laws, Chap. 632. It is apparent from the General Assembly's use of the phrase:

> *In addition to* the authority provided elsewhere in this subsection, *and provided* the municipal corporation has urban renewal authority granted under Article III, Section 61 of the Maryland Constitution,

Md.Code (1957, 2001 Repl.Vol.), Art. 23A, § 2(b)(37) (emphasis added), that the General Assembly intended the grant of urban renewal authority under Article III, Section 61 to be a prerequisite to the municipality being able to condemn a blighted property within a non-blighted area. Therefore, the condition precedent enumerated in Section 2(b)(37) of Article 23A that the municipality be empowered to condemn "slum areas" or "blighted areas" pursuant to Article III, Section 61 of the Maryland Constitution is satisfied in the present case, and the City was empowered to condemn individual blighted properties located within non-blighted areas.

Pickett presents us with three alternate bases for upholding the Circuit Court's dismissal of the condemnation action: the action was *ultra vires* because of the manner in which the ordinance regarding the Property was approved by the Board of Aldermen; the Circuit Court lacked *in rem* jurisdiction over the Property; and the City's actions throughout the

---

depreciation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitary facilities, or any combination of these factors, are detrimental to the public safety, health or morals. The term "blighted area" shall mean an area in which a majority of buildings have declined in productivity by reason of obsolescence, depreciation or other causes to an extent they no longer justify fundamental repairs and adequate maintenance.

\* \* \*

(b) The general Assembly may grant to any county or any municipal corporation, by public local law, any and all additional power and authority necessary or proper to carry into full force and effect any and all of the specific powers authorized by this section and to fully accomplish any and all of the purposes and objects contemplated by the provisions of this section, provided such additional power or authority is not inconsistent with the terms and provisions of this section or with any other provision or provisions of the Constitution of Maryland.

condemnation process were motivated by bad faith. We shall address each in turn.

█ At argument before this Court and by implication in his brief, Pickett conceded that the enabling ordinance was signed by the Mayor of the City of Frederick prior to the signing of the ordinance that applied specifically to the Property; however, he continued to maintain that because the enabling ordinance was not in effect prior to the Board of Aldermen's fact-finding hearing regarding the condemnation of the Property, the Board was acting beyond its authority and the ordinance condemning his property was *ultra vires.* We disagree.

Pickett argues that an effective enabling ordinance was required before the City could properly exercise the authority to condemn individual property under Article 23A, Section 2(b)(37). The express language of Article 23A, Section 2(b)(37) does not enumerate the enactment of an enabling ordinance among the conditions precedent to the municipality exercising its authority to condemn a blighted property within a non-blighted area. As we recently noted, where the legislature intends to include a particular provision within a statute, it generally does so expressly. *See Johnson v. Mayor and City Council of Baltimore City,* 387 Md. 1, 16 n. 9, 874 A.2d 439, 448 n. 9 (2005). The General Assembly has expressly required enabling ordinances or resolutions in other circumstances such as the issuance of bonds by municipal corporations, *see* Md.Code (1957, 2001 Repl.Vol.), Art. 23A §§ 33 and 34, yet has not done so in Article 23A, Section 2(b)(37). Therefore, because the General Assembly did not expressly require that the municipality enact an enabling ordinance in Article 23A, Section 2(b)(37), we conclude that an enabling ordinance is not required to utilize the powers explicated in that statute. We hold that the Board of Aldermen possessed the authority to conduct a fact-finding hearing when it did so and was empowered to pass the ordinance applicable to the property at issue in the case at bar prior to the Mayor's approval of the enabling ordinance.

■ Furthermore, assuming that the City was required to enact an enabling ordinance to exercise its condemnation power under Article 23A, Section 2(b)(37), the ordinance permitting it to condemn the Property was not *ultra vires.* We addressed the similar issue of a legislature's ability to pass legislation prior to an enabling statute's effective date in *Blumenthal v. Clerk of the Circuit Court for Anne Arundel County,* 278 Md. 398, 365 A.2d 279 (1976). The action in *Blumenthal* arose out of legislation enacted by the General Assembly that permitted the counties and Baltimore City to establish through ordinance or resolution their own tax rate for the "recordation of instruments conveying title and securing debts." *Id.* at 400, 365 A.2d at 281. The statute provided that it would become effective on July 1, 1968. *Id.* at 409, 365 A.2d at 286. The counties and Baltimore City, however, enacted tax rate ordinances prior to the effective date of the statute. Mr. Blumenthal and his co-plaintiffs argued that even if the statute "permit[ted] Baltimore City and the counties to·fix the recordation tax rate, the ordinances enacted by Baltimore City and by Baltimore and Charles Counties, though adopted after [the statute] was signed and though not themselves to become effective until July 1, are void because they were promulgated prior to the effective date" of the enabling statute. *Id.*

We determined that "the County Commissioners may exercise 'the authority with which (they have) been expressly, or as a reasonable implication, invested by law.' " *Id.* (additions in original), quoting *Montgomery Co. v. Met. District,* 202 Md. 293, 304, 96 A.2d 2 ˘. 357 (1953). Concomitantly, we stated our conclusion that "by reasonable implication [the statute] conferred upon the political subdivisions the power to adopt, prior to the effective date of the statute, implementing legislation which itself was not to become operative until that very same effective date." *Blumenthal,* 278 Md. at 410, 365 A.2d at 286. We also quoted with approval from the Supreme Court's reasoning in *Druggan v. Anderson,* 269 U.S. 36, 46 S.Ct. 14, 70 L.Ed. 151 (1925). In *Druggan,* Congress enacted the National Prohibition Act before Prohibition went into effect, but after

the Eighteenth Amendment was ratified. Justice Holmes, writing for the Supreme Court, observed that Congress has "a present power to enact laws intended to carry out constitutional provisions for the future when the time comes for them to take effect." *Id.* at 39, 46 S.Ct. at 15, 70 L.Ed. at 153.

This reasoning is controlling in the case *sub judice.* Assuming *arguendo,* that the City was required to enact an enabling ordinance prior to exercising its power to condemn individual blighted properties within a non-blighted area, the Board of Aldermen could nevertheless engage in a fact-finding hearing and pass an ordinance in anticipation of the Mayor's approval of the enabling ordinance under the rationale explicated in *Blumenthal.* Moreover, as Pickett conceded, the enabling ordinance was approved by the Mayor prior to her approval of the ordinance specifically applicable to the Property, and therefore, the ordinance permitting the condemnation of the Property was not effective before the enabling ordinance was given effect. Thus, pursuant to our reasoning in *Blumenthal,* the Board of Aldermen did not act beyond the scope of its authority in passing the ordinance authorizing the condemnation of Pickett's property prior to the mayor's signing of the enabling ordinance because the specific ordinance was not in effect prior to the enabling ordinance.

Pickett also presents lack of *in rem* jurisdiction and bad faith as alternate grounds for affirming the Circuit Court's dismissal of the City's condemnation action. During the evidentiary hearing, the majority of both parties' argument focused on the construction of Article 23A, Section 2(b)(37) and the issue of whether the Board of Aldermen's passage of the ordinance condemning Pickett's property was *ultra vires.* Beyond Michael Blank's deposition testimony concerning the issuance of the citations with respect to the Property and his awareness of an accurate address for service of process, which was read into the record, the issue of *in rem* jurisdiction was not developed. Moreover, it is unclear whether Pickett was arguing that the findings made by the Board of Aldermen were made in bad faith or that the City's efforts to effect service of process to obtain *in rem* jurisdiction were made in

bad faith, or both. Furthermore, the Circuit Court, although presented with argument concerning *in rem* jurisdiction and bad faith, did not specifically address the contentions. Therefore, because there is a dearth of necessary factual detail in the record regarding these contentions, we will not affirm the Circuit Court's decision on those grounds. *See Berman,* 308 Md. at 263, 518 A.2d at 728; *see also Robeson,* 285 Md. at 502, 403 A.2d at 1223 (and cases cited therein), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980).

### *Conclusion*

Based on the plain language of Maryland Code (1957, 2001 Repl.Vol.), Article 23A, Section 2(b)(37), we conclude that the City of Frederick is empowered to condemn individual blighted properties within a non-blighted area. Moreover, although we may affirm the dismissal of the City's condemnation action on alternate grounds, we determine that the Board of Aldermen's passage of the ordinance condemning Pickett's property was not an *ultra vires* action and thus, the dismissal may not be upheld on that ground. Furthermore, because the issues of lack of *in rem* jurisdiction or bad faith were not adequately developed in the record, we will not affirm the dismissal on those grounds and leave those issues open for the Circuit Court to address on remand if necessary. Therefore, we reverse.

***JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.***